[Civ. No. 33936. Second Dist., Div. Two. Oct. 29, 1969.]

DOMENIC CAPALDI et al., Plaintiffs and Respondents, v.
LEON LEVY, Defendant and Appellant.

## COUNSEL

Mack, Nast & Boss and George P. Coulter for Defendant and Appellant.

Lynn R. Pettler, Price & McDaniel and Chester A. Price, Jr., for Plaintiffs and Respondents.

## OPINION

**HERNDON, Acting P. J.**—Leon Levy (also known as Lee Leonard), the purchaser under a contract for the purchase and sale of all of the corporate stock of Linda Homes, Inc., appeals from a judgment awarding to the sellers Domenic Capaldi, Gino Capaldi, and W. Garfield McDaniel the sum of $18,000 (representing the entire contract price) plus interest from the date of Levy's breach.[1]

Appellant contends (1) that the contract was ambiguous and not specifically enforceable; (2) that the failure of the sellers to strictly adhere to and perform the conditions of the contract excused the purchaser from further performance; (3) that the damages awarded were excessive; (4) that the judgment is invalid because it requires the purchaser to pay the contract price without requiring the sellers to perform; and (5) that the court's failure to make findings on material issues pursuant to appellant's

---

[1]The attempted appeal by Levy from the nonappealable order denying his motion for a new trial will be dismissed. (Code Civ. Proc., § 904.1.)

request entitles appellant to a new trial. Analysis reveals that except for the first of these contentions, practically all of appellant's arguments are devoted to challenges to the sufficiency of the evidence to support the trial court's findings of fact. Our review has satisfied us that the trial court's findings decide every material issue of fact; that each of these findings is supported by substantial evidence; and that the judgment is legally supported in all respects.

The record discloses that Linda Homes, Inc. was incorporated by Gino Capaldi and his father, Domenic, acting together with their attorney, W. Garfield McDaniel, in the spring of 1962. The three incorporators made a total initial cash contribution of $6,000 and in consideration therefor received 600 shares of common stock. The three shareholders subsequently made cash loans to the corporation in the total amount of $12,000. The total investment thus established was $18,000.

It was the purpose and intention of the incorporators of Linda Homes at the time of its incorporation to engage in the construction of a tract of new homes which would be started by the construction of one or more model homes for the inspection of prospective purchasers. It was contemplated that each home purchaser would enter into a contract for the construction of the new dwelling according to plans and specifications similar to the model selected and that the new home would be built upon a designated lot in the tract area.

With this goal in mind Linda Homes erected a model home and, having suitably decorated the home to serve as both a model and the corporate office, Linda Homes engaged in sales and construction activity. In the construction of the model home Linda Homes received the financial assistance of certain subcontractors and materialmen who contributed services and/or materials pursuant to specific written agreements under which they agreed to withhold charges or liens against the model home pending the execution of subcontracts by Linda Homes for labor and materials in the anticipated construction of homes to be sold from the model. It was anticipated that subcontracts would then be let to those who had contributed to the model and that these subcontractors and materialmen would, in turn, credit against the account relating to the model a specific percentage of the charges applicable to each succeeding construction job until the model home account was satisfied.

In this manner, the construction of the model was completed, and a sales manager was employed to sell new homes on the basis of the construction model. The arrangement between Linda Homes and its subcontractors, of course, assumed (1) that Linda Homes would continuously engage in the business of selling, contracting for, and constructing new homes, and (2) that it would, out of practical economic considerations, continue to do

business with those who contributed to the model until each of their accounts had been satisfied.

The company entered upon the construction of at least seven homes and obtained construction contracts for eleven more before the fall of 1962. Upon the execution of each construction contract, financing was arranged with a savings and loan association and the transaction was handled in the usual manner of construction financing. Linda Homes as general contractor was entitled to draw expenses and overhead and to pay its subcontractors for work done on each construction job by vouchers drawn on the lending institution. The lender would accept and verify the vouchers and would then issue checks in satisfaction of the cost of work and materials as construction progressed. The lender and Linda Homes each maintained separate cost breakdown sheets for comparison of the loan balance and/or contract price of each home with the amounts paid out and/or liabilities incurred as construction proceeded. Linda Homes referred to these as "cost construction control sheets" and entries were made thereon from time to time by Gino Capaldi, McDaniel, and McDaniel's wife.

Ultimately, however, it became apparent to Linda Homes' officers that more money would be needed to continue operations because profit margins on its contracts were too low. By September of 1962, it appeared to Gino Capaldi that if an infusion of new capital were not received soon, the company could remain in business only a few weeks longer. Capaldi had a friend of many years' standing named Benny Campisi. Campisi at about this time introduced Capaldi to appellant Leon Levy, a real estate broker with whom Campisi anticipated doing business in partnership.

Levy, as a prospective purchaser of the company, visited the corporate offices to survey the operation of the business and to negotiate for the purchase of the corporation. Shortly thereafter an accountant employed by Levy took possession of and examined all of the accounting ledgers and the corporate books and records of Linda Homes, Inc. In addition, Campisi personally examined and observed all but one of the construction sites. The construction contracts, subcontracts and cost construction control sheets relating to each job undertaken by Linda Homes, Inc. were subjected to the personal review and scrutiny of Levy and Campisi.

Thereafter, on October 3, 1962, the parties executed a written agreement for the purchase and sale of all of the corporate stock of Linda Homes, Inc. then issued and outstanding. On the same day the contract was deposited in an escrow which was opened to effect the transfer and Levy made a down payment of $5,000 in cash therein. It is provided in the written agreement that its terms shall be incorporated in the contemplated escrow instructions. The escrow instructions, which were signed by all parties, further provided: "It is understood and agreed between seller and

purchaser that physical possession shall be [delivered] on October 4, 1962."

Appellant went into possession of the corporate office, the corporation's property and its assets, including the model home, within two days after the written agreement was executed. However, he failed and refused thereafter to execute the promissory note for the balance of the agreed purchase price of $18,000, or to place in escrow a trust deed or trust deeds on other property as security for the payment of the balance of the purchase price. In less than a month, in fact, Levy abandoned the business and thereafter failed and refused to complete the escrow for the sale of the corporate stock.

The escrow remained open for a period of almost a year. During that period appellant executed a quitclaim deed to his parents without consideration purporting to transfer to them the parcel of real property on which he had agreed to place a lien as security for the payment of the balance of the purchase price of Linda Homes stock. Ultimately the $5,000 fund which appellant Levy had deposited in escrow was levied upon under a writ of execution issued pursuant to a consent judgment which had been entered against appellant and in favor of appellant's father, Morris Levy, who is a codefendant in the instant lawsuit. It appears that Morris Levy received $4,988 of the $5,000 deposited in the escrow and that only about two weeks after his judgment had been satisfied he loaned appellant $4,000 again. On the basis of the evidence establishing these facts, the court imposed upon the property in the hands of Levy's father a constructive trust on the theory that the latter had participated in perpetrating a fraud on respondents, appellant's creditors. This aspect of the judgment is not questioned and Morris Levy has not appealed.

Appellant's notice of motion for new trial (Code Civ. Proc., § 657) was made upon the grounds that the court's abuse of discretion denied appellant a fair trial; that appellant had newly discovered evidence; that the damages awarded were excessive; that the evidence was insufficient to support the decision; and that there was error in law at the trial. The notice recites that the motion is made "upon this notice, upon the minutes of the Court and upon all of the records in this case, and upon declarations and points and authorities to be submitted hereafter." Since no supporting documents were filed with the court within the statutory time (Code Civ. Proc., § 659a), or at all, the claim of denial of a fair trial and newly discovered evidence may be disregarded (Code Civ. Proc., § 658; *Gardner v. American Brake etc. Co.,* 24 Cal.2d 686 [151 P.2d 122]). Appellant's contentions that the damages are excessive and that the evidence is insufficient, as well as his other assignments of error, are considered and rejected hereinafter.

Appellant contends that the written agreement is not specifically en-

forceable because the escrow instructions do not specifically identify the real property which the purchaser was required to encumber in order to secure his note for the balance of the purchase price; that one of the contracts allegedly held by Linda Homes is not designated; and, finally, that respondents' remedy in damages at law is adequate.

■ The contract provides that the exact nature and extent of the security for the promissory note is to "be determined." The record discloses, however, that a specific parcel of real property situated in Ventura County had been proposed as security by Levy at or about the time the agreement was executed and that this property had been inspected and approved by the sellers. The court therefore found, on substantial evidence, that agreement was reached definitely identifying the real property to be encumbered with respondents' security interest. Furthermore, it was established that although only 10 of the promised 11 construction contracts were listed in the agreement by street address, the additional contract is described in the next succeeding paragraph which provides for the future assignment of a construction contract on property described as 7439 Nestle, Reseda, California.

"Neither law nor equity requires that every term and condition of an agreement be set forth in the contract. (*King* v. *Stanley,* 32 Cal.2d 584 [197 P.2d 321]; *Martin* v. *Baird,* 124 Cal.App.2d 598 [269 P.2d 54]; 45 Cal.Jur.2d, Specific Performance, § 17, pp. 272-273.) The usual and reasonable terms found in similar contracts can be looked to, unexpressed provisions of the contract may be inferred from the writing, external facts may be relied upon, and custom and usage may be resorted to in an effort to supply a deficiency if it does not alter or vary the terms of the agreement. [Citations.]" (*Burrow* v. *Timmsen,* 223 Cal.App.2d 283, 288 [35 Cal. Rptr. 668, 100 ALR2d 544].) The terms of the escrow and the written agreement, being in all other respects clear and complete, are specifically enforceable.

Especially since the adoption of the Uniform Sales Act in 1931, the trend of decision has been in the direction of sanctioning specific enforcement of contracts to sell or transfer personal property. (*Bomberger* v. *McKelvey,* 35 Cal.2d 607, 616 et seq. [220 P.2d 729].) The propriety of specific enforcement of contracts to sell or convey unique items of personal property such as shares of stock in closely held corporations which are not traded in the market and which have no established market value has long been recognized. (*Wait* v. *Kern River Min. etc. Co.,* 157 Cal. 16, 24 [106 P. 98]; 4 Witkin, Summary of Cal. Law (1960) Equity, § 21, pp. 2804-2806.)

■ In the case at bench it obviously was necessary to invoke the equitable remedy which was utilized in imposing the constructive trust

upon fraudulently conveyed property in order to afford respondents the relief to which they were legally and equitably entitled under the express terms of the contract. (*Kirch* v. *Wattell,* 40 Cal.App. 501, 502 [181 P. 111].) Whether the relief granted in this case be classified as specific performance in the traditional sense or as quasi-specific performance, it is clear that all of the requisites for the granting of such relief were established. (Cf. *Henderson* v. *Fisher,* 236 Cal.App.2d 468, 473 [46 Cal.Rptr. 173].)

■ The escrow instructions provide not only that the purchaser shall go into immediate possession of the records and property of the corporation, but that escrow "shall close upon transfer of the stock to the purchaser herein as approved by the Division of Corporations of the State of California." Respondents promptly deposited in escrow all the corporate books and records, the stock certificate made out to appellant and the consent to transfer to appellant the shares of Linda Homes as validly issued by the California Corporations Commissioner. There remained no further conditions to be performed by the sellers who "fully performed all things required of them to be performed under the contract and the escrow agreement" according to the court's findings supported by substantial evidence.

■ Appellant next contends that the amount of damages awarded was excessive. The trial court awarded damages in the amount of $18,000 plus interest from the date of the agreement. As has been shown, this figure is equal to the investment respondents actually had made in the corporate venture which appellant purchased. In short, the amount of $18,000 was agreed upon by the parties as the reasonable value of the corporate stock as of the time of its sale to Levy, and on this basis the trial court also found that this sum constituted the reasonable value of the property.

■ Appellant contends that it was the duty of the sellers to mitigate damages from and after the time when he repudiated the purchase agreement and abandoned the property. The sellers, however, having fully performed their obligations under the written agreement and escrow instructions, had no further duty with respect to the operation of the corporation, the books, records and assets of which had been delivered to appellant. It is obvious that the doctrine requiring mitigation of damages has no application to the facts of this case.

"The duty to minimize damages does not require an injured person to do what is unreasonable or impracticable, . . . [Citations.]" (*Valencia* v. *Shell Oil Co.,* 23 Cal.2d 840, 846 [147 P.2d 558].) Under the circumstances of this case appellant was not entitled by his breach of contract to impose upon the sellers a duty to resume the burdens and obligations of ownership. Appellant had assumed, after the execution of the valid and

enforceable agreement of purchase and sale, and upon taking possession of the corporate assets, the complete responsibility for the future operations of the company. This he did, as the trial court found, after a complete and accurate disclosure by the sellers of the company's financial condition, and after he had made his own independent examination of the corporate records, the construction cost control sheets, and the construction contracts.

Appellant further contends that the judgment is inequitable because it requires the purchaser to pay the reasonable value of the corporate stock without concomitantly directing the sellers to perform the conditions precedent. He claims that breach by the sellers of certain conditions excused his further performance. The provisions of the written agreement which he relies upon as conditions to be performed by the sellers are (1) the transfer of title to the corporate stock free and clear of any and all obligations not specified in the sales agreement; (2) the delivery to the purchaser of 11 valid and subsisting construction contracts as delineated in the purchase agreement; and (3) the transfer of the $12,000 shown on the corporate books as "loans to officers" to paid-in capital.

The record establishes that respondents performed each and every one of these conditions of the contract. The trial court found that "the Plaintiffs have fully performed all things required of them under the contract and the escrow agreement and have been excused from performance of any acts after November 1, 1962, by reason of the breach of the Defendant LEON LEVY. This finding is fully supported by the evidence.

The sellers agreed to transfer the shares of corporate stock to Levy free and clear of all obligations not listed in the written agreement which further provided in substance that, in the event the sellers receive written notice that any liabilities or obligations are "asserted against said corporation or the successor or buyers as having been incurred or created by said corporation *prior to the date of the transfer of shares of stock* contemplated herein, sellers do hereby agree to forever indemnify and save harmless said corporation, its successors or buyers from any loss by reason thereof." (Italics added.) The admitted claim of Northridge Lumber Company against Linda Homes cannot be relied upon by appellant to constitute a breach by respondents because it was first asserted on November 14, 1962, approximately two weeks following appellant's breach and abandonment of the purchase contract, and second, because it was not shown that it related to an obligation incurred prior to the date of transfer of the shares. It may, in fact, be reasonably inferred that this claim for materials contributed to the model home would have been withheld if appellant had not breached his agreement and had continued to manage and operate the construction business as he had undertaken to do.

The sellers deposited in escrow the written contract, the minute book,

stock book, corporate records and seal, the consent to transfer and the new share certificate in the name of the purchaser. They further testified that the corporate books of account, construction cost control sheets and contracts were delivered to Levy at the time he took possession of the corporate offices. Moreover, the construction contracts were listed and identified in the written agreement which was prepared by appellant's attorney and executed by appellant after his independent examination of the corporate records and the construction contracts. Appellant denied at the time of the trial, five years later, that he had received the contracts and since no copies could be found, the contracts could not be introduced in evidence. The reasonable inference, however, from the fact that the contracts were specified in the written agreement, and the further testimony that they were reviewed during negotiations for the purchase of the company, is that the contracts were then in existence. The evidence was insufficient to cast doubt on the sellers' good faith in delivering these contracts to appellant.

Appellant contends, finally, that the trial court erred in failing to make findings on material issues pursuant to his request for special findings. Our review of appellant's request to the trial court discloses that the document is composed in the main of argumentative assertions and untenable objections to the trial court's findings and that it requests findings on irrelevant and immaterial or collateral matters. Essentially it is merely an argument concerning the weight of the evidence and the inferences to be drawn therefrom.

 "When a party relies upon this ground he must show to the appellate court not only that no finding was made upon a material issue, but also that the evidence would justify a finding in his favor." (*Furlong* v. *White,* 51 Cal.App. 265, 272 [196 P. 903].) "Where an appellant claims that some particular issue of fact is not sustained by the evidence, he is required to set forth in his brief all of the material evidence on the point and not merely his own evidence. If this is not done, the error assigned is deemed waived." (*Routh* v. *Palm Oil Co.,* 160 Cal.App.2d 359, 360-361 [324 P.2d 936]; *Schaefer* v. *Berinstein,* 180 Cal.App.2d 107 [4 Cal.Rptr. 236].)

In the opening brief of counsel, no quotation is made of any testimony nor is reference made to any part of the transcript in which may be found any evidence of fraud, undue influence, or want of consideration. Although for that reason we would be entirely warranted in assuming that no such evidence is contained therein, we have read the entire transcript and we are satisfied that this contention of appellant cannot be maintained. (*Estate of Carpenter,* 127 Cal. 582 [60 P. 162]; *Winslow* v. *Gohransen,* 88 Cal. 450 [26 P. 504]; *Himmelman* v. *Henry,* 84 Cal. 104 [23 P. 1098].) In fact, the

only evidence of fraud in the instant record relates to appellant's own conduct in transferring assets to his parents without a consideration in an attempt to defraud his own creditors, a finding which is not questioned on this appeal.

The evidence disclosed by the record is sufficient to support each of the findings and to entitle respondents to recover from appellant the amount he agreed to pay for the property he purchased and the amount which the trial court found to be the reasonable value of the property at the time of the sale.

The judgment is affirmed, and the appeal from the order denying the motion for a new trial is dismissed.

Fleming, J., and Wright, J., concurred.