[Civ. No. 38412. First Dist., Div. Two. Apr. 25, 1977.]

DIVISION OF LABOR LAW ENFORCEMENT,
Plaintiff and Appellant, v.
TRANSPACIFIC TRANSPORTATION COMPANY,
Defendant and Respondent.

**COUNSEL**

Marilyn Shinderman, Gerald Friedman, Arthur Stahl and Lelia H. Jabin for Plaintiff and Appellant.

Frolik, Filley & Schey and Walter M. Schey for Defendant and Respondent.

**OPINION**

**KANE, J.**—The Division of Labor Law Enforcement (Division) appeals from an adverse judgment to recover wages for its assignors, former employees of respondent Transpacific Transportation Company (Transpacific).

The basic facts are not in .dispute. Prior to November 30, 1970, all of the Division's assignors were employees of Transpacific. At that time, Japan Line accounted for about 65 percent of Transpacific's activities as a steamship agency. After Transpacific's attempt to negotiate a more

satisfactory arrangement with Japan Line failed, it was advised that effective December 1, 1970, Japan Line would open its own San Francisco office. Accordingly, Transpacific in July and August 1970 advised its employees of a pending reduction in its work force as of November 30, and that Japan Line wished to employ many of them. On November 30, 1970, Transpacific reduced its 80-person work force. Eleven of these began to work for Japan Line on December 1, 1970, as a result of their earlier acceptance of Japan Line's offers of employment.

Between 1958 and 1973, Transpacific usually paid its salaried employees a bonus of 10 percent[1] of the annual salary. The bonus was authorized by Transpacific's overseas shareholders in December and usually paid in mid-December,[2] separately from the mid-month salary payment to the employees then with the company. Each bonus check was accompanied by a letter designating the check variously as a Christmas gift or bonus.

On December 15, 1970, Transpacific paid the usual 10 percent bonus. None of the employees who had been terminated on November 30, 1970, received a bonus; 14 subsequently assigned their claims to the Division.[3]

All of the Division's assignors were clerical and nonexecutive employees of Transpacific. Each was hired on an at-will basis. Although Transpacific's past practice of paying an annual Christmas bonus was mentioned during preemployment interviews, *it was emphasized that the payment of future bonuses was contingent on the decision of the company's shareholders; indeed, that there was no guarantee whatsoever that bonuses in the future would be paid. The record also contains affirmative evidence that the Division's assignors would have accepted employment with respondent even if there had been no mention of a bonus;*[4] that they would not have quit earlier even if there had been no year-end bonus; that they

---

[1]From 1961-1963, the bonus was 9 percent.

[2]There was no set date, except that it usually preceded Christmas; the record indicates that the date ranged from December 6, in 1961, to December 17, in 1971.

[3]Fourteen of the persons who were discharged as of November 30, 1970, assigned their claims to the Division. At the time of trial, the Division withdrew its claim as to two (Peebles and Larson) who had been discharged for cause in October 1970; another (Patterson) failed twice to appear for a deposition. The court concluded that proof had failed as to these three. All 11 of the Division's assignors involved in this appeal were employed by Japan Line.

[4]This evidence alone refutes the philosophical dictum expressed by the dissent that payment of bonuses should not be discouraged where "the employer refers to the bonus in urging people to accept or continue employment, *as in this case.*" (Dis. opn.,

would not have expected a bonus had they left respondent's employment prior to November 30, 1970; and that no demand as to bonus would have been made had respondent not given one to its remaining employees. Finally, the record discloses that while all the complaining employees assumed that the payment of a bonus was based on the fiscal year, the bonus was in fact always paid on a calendar year basis and was payable only to those still-employed on the date of declaration.

The Division's complaint against Transpacific alleged four causes of action and sought equitable relief. The first cause of action was founded on express contract to pay a bonus; the second, on penalties due for late payment of wages pursuant to Labor Code, section 203; the third on implied contract; and the fourth on promissory estoppel.[5]

After receiving extensive (and in many instances conflicting) evidence, and after hearing the legal arguments of the parties, the trial court, sitting without a jury, found inter alia that the assignors, when hired, were advised that Christmas bonuses paid in the past had been gifts; that Transpacific made neither an express nor an implied promise to pay bonuses to its employees; that a condition precedent to any future bonuses was an employment relationship existing with respondent at the time of the payment of the bonus; that the assignors had no vested right to the bonus prior to its announcement by respondent; and that the termination of the assignors' employment was due to legitimate business reasons rather than any malice or desire to avoid paying the Christmas bonus.[6] In accordance therewith, the trial court rendered judgment on all counts in favor of respondent.

---

*infra,* p. 280; italics added.) The clear record and the trial court's findings demonstrate that, in fact, the employees were not so urged. On a philosophical note, however, we would observe that the dissent would impose a *contractual* obligation to pay a bonus from the mere discussion of the subject during a preemployment interview coupled with a Good Samaritan history. Such a result would leave employers but one choice—eliminate all Christmas bonuses and refuse to discuss the subject during preemployment interviews or at any time during the period of employment.

Furthermore, for all we know from the record before us, Transpacific may have carried assignors on its payroll until November 30, 1970, to allow them to obtain employment with Japan Line. While this is admittedly speculative, it is equally conjectural to suggest that Transpacific treated assignors in some inequitable fashion by not discharging them until November 30, particularly since, as we have pointed out, Transpacific notified assignors in July and August 1970 of the necessity to cut back and that Japan Line would employ many of them.

[5]On appeal the Division raises issues as to the third and fourth causes of action only.

[6]The relevant portions of the findings read as follows:

"5. *When hired, the said assignees [sic] were advised that defendant had paid, as a gift, a Christmas bonus in the past. No promise was made that a bonus would be paid in the future.*

On appeal it is contended that the judgment should be reversed because (1) the trial court failed to make special findings as requested by the Division, and (2) certain portions of the findings are not supported by sufficient evidence. An analytical review of the record in conjunction with the pertinent legal principles compel the conviction that neither of appellant's contentions is well taken and as a consequence the judgment of the trial court must be upheld.

Before determining whether the trial court's failure to make special findings constituted reversible error, we call to mind the general rules pertaining to the necessity and scope of findings. To begin with, we observe that section 632 of the Code of Civil Procedure provides in broad terms that "Where findings are required, they shall fairly disclose the court's determination of all issues of fact in the case." ▮ The case law interpreting this section, however, specifies that the rule calling for findings of fact *requires a finding of ultimate rather than evidentiary facts (Hayward Lbr. Co. v. Construction etc. Corp.* (1952) 110 Cal.App.2d 1, 3 [241 P.2d 1054]). This is so because under well settled law the findings of ultimate facts include by necessary intendment the findings on all intermediate evidentiary facts necessary to sustain them (*Jay* v. *Dollarhide* (1970) 3 Cal.App.3d 1001, 1032 [84 Cal.Rptr. 538]). Since the trial court must find only the ultimate facts necessary to support the judgment upon the essential issues which are presented by the pleadings (*Forman* v. *Hancock* (1934) 3 Cal.App.2d 291, 296 [39 P.2d 249]), our task is limited to a determination whether the facts found by the trial court are adequate to adjudicate the essential elements of the challenged causes of action.

Prior to addressing this fundamental issue, we reiterate that appellant predicated its theory of recovery partly on a contractual basis (express

*Any future bonus would be payable, if at all, only to those employed at the time the bonus was paid; it was understood that there was no vesting of any rights with respect to the bonus payment prior to the date that the bonus was announced to defendant's employees.*
"6. Defendant's employment of John W. Peebles terminated October 2, 1970. Defendant's employment of the other assignors terminated November 30, 1970. *The termination of the assignees' [sic] employment by defendant was the result of defendant's having lost the business of Japan Line,* its largest account, *and not because of any malice on the part of defendant or desire on the part of defendant to avoid paying a Christmas bonus.*
"7. On December 15, 1970, defendant announced and paid a Christmas bonus of 10% of salary for the period January 1, 1970 through December 31, 1970 to its then employed office employees, exclusive of management staff.
"8. *Defendant neither expressly nor impliedly promised any of the assignors that it would at any time pay a bonus.*
"9. None of the assignors were paid a Christmas bonus in 1970." (Italics added.)

and implied in fact contract to pay bonuses to the assignors), partly on the equitable doctrine of promissory estoppel. ■ As frequently underlined, the vital elements of a cause of action based on contract are mutual assent (usually accomplished through the medium of an offer and acceptance) and consideration. As to the basic elements, there is no difference between an express and implied contract. While an express contract is defined as one, the terms of which are stated in words (Civ. Code, § 1620), an implied contract is an agreement, the existence and terms of which are manifested by conduct (Civ. Code, § 1621). As the cases explain, both types of contract are identical in that they require a meeting of minds or an agreement (*Desny* v. *Wilder* (1956) 46 Cal.2d 715, 735 [299 P.2d 257]). Thus, it is evident that both the express contract and contract implied in fact are founded upon an ascertained agreement or, in other words, are consensual in nature, the substantial difference being in the mode of proof by which they are established (*Caron* v. *Andrew* (1955) 133 Cal.App.2d 412, 417 [284 P.2d 550]). While an implied in fact contract may be inferred from the conduct, situation or mutual relation of the parties, the very heart of this kind of agreement is an intent to promise. As the court put it in *Mulder* v. *Mendo Wood Products, Inc.* (1964) 225 Cal.App.2d 619, 632 [37 Cal.Rptr. 479], "*The true implied contract consists of obligations arising from* a mutual agreement and *intent to promise* where the agreement and promise have not been expressed in words." (Italics added.)

■ Promissory estoppel, appellant's alternative theory of recovery, is based upon the equitable doctrine that a promisor is bound when he should reasonably expect a substantial change of position (act or forbearance) in reliance on his promise if injustice can be avoided only by the enforcement of the promise (Rest., Contracts, § 90;[7] *Graddon* v. *Knight* (1956) 138 Cal.App.2d 577, 582 [292 P.2d 632]; *Wade* v. *Markwell & Co.* (1953) 118 Cal.App.2d 410, 419 [258 P.2d 497, 37 A.L.R.2d 1363]; 1 Witkin, Summary of Cal. Law (8th ed. 1973) § 189, pp. 174-175). The doctrine of promissory estoppel, which is recognized in California and has been applied in a variety of factual situations, has three basic elements: (1) promise; (2) reliance; and (3) injury (*Henry* v. *Weinman* (1958) 157 Cal.App.2d 360, 366 [321 P.2d 117]; *Blatt* v. *University of So. California* (1970) 5 Cal.App.3d 935, 943 [85 Cal.Rptr. 601]). The

[7]Section 90 of Restatement of Contracts reads as follows: "*A promise* which the promisor should reasonably expect *to induce action or forbearance. of a* definite and *substantial character* on the part of the promisee and which does induce such action or forbearance *is binding* if injustice can be avoided only by enforcement of the promise." (Italics added.)

existence of these elements constitute a question of fact as does the existence of an implied in fact contract (*General Motors Accept. Corp.* v. *Gandy* (1927) 200 Cal. 284 [253 P. 137]; *Henry* v. *Weinman, supra*; *Medina* v. *Van Camp Sea Food Co.* (1946) 75 Cal.App.2d 551, 556 [171 P.2d 445]).

■  When viewed and analyzed in light of the foregoing principles, the record leaves no doubt that the trial court made findings on the crucial ultimate facts of both the implied contract and the promissory estoppel causes of action, and as a consequence its refusal to make the requested special findings was proper.

Thus, it appears that by reviewing and evaluating a host of evidence the trial court found that although respondent had paid Christmas bonuses as a gift in the past, it made neither an express nor an implied promise to pay any bonus to its employees. This finding of the trial court cannot be interpreted other than as a finding of ultimate fact which must be deemed to have adjudicated by necessary implication all the intermediate evidentiary facts supporting the finding (*Jay* v. *Dollarhide, supra*), including the ones raised in appellant's request for special findings. At the same time, this finding negating the existence of any express or implied promise must also be deemed a crucial one which conclusively refuted appellant's claim predicated on the theory of implied contract, and thereby rendered any further findings on the matter redundant and legally insignificant.

■  Appellant's contention, that the trial court's finding of lack of promise as to payment of any future bonus is not supported by the evidence, loses sight of the often stated rule that in reviewing the sufficiency of the proof we must disregard conflicting evidence and examine solely the question whether there is any substantial evidence to sustain the challenged finding (*Primm* v. *Primm* (1956) 46 Cal.2d 690, 693 [299 P.2d 231]).

When so tested, the record at hand discloses that both Mr. Kroll, who interviewed the majority of the assignors, and the other interviewer, Mr. Lewald, testified that while mention had been made of the company's past practice of paying bonuses to its employees, the payment of future bonuses was conditional, uncertain and there was absolutely no guarantee with regard to any future bonuses. This testimony of the company's

officials was, in fact, corroborated by several assignors.[8] ■ As pointed out earlier, the very heart of an enforceable implied in fact contract is the mutual intention of the parties; hence the assumption, intention or expectation of either party alone can give rise to no inference of an implied contract (*Gold* v. *Gibbons* (1960) 178 Cal.App.2d 517, 520 [3 Cal.Rptr. 117]).

In view of the foregoing conclusion, it is unnecessary to decide whether appellant should be denied recovery for the additional reason that, contrary to a crucial precondition requiring employment at the time of the declaration of the bonus, the assignors here were not in the employ of Transpacific on December 15, 1970, when the bonus in dispute was announced.

■ Turning to appellant's claim predicated on the doctrine of promissory estoppel, we observe the trial court's finding that respondent had promised no future bonus to its employees is determinative of this cause of action as well. As noted before, a promise is an indispensable element of the doctrine of promissory estoppel. The cases are uniform in holding that this doctrine cannot be invoked and must be held inapplicable in the absence of a showing that a promise had been made upon which the complaining party relied to his prejudice (*Southern Cal. Acoustics Co.* v. *C. V. Holder, Inc.* (1969) 71 Cal.2d 719, 723 [79 Cal.Rptr. 319, 456 P.2d 975]; *Bard* v. *Kent* (1942) 19 Cal.2d 449, 453 [122 P.2d 8,

---

[8]The illustrative portions of the record state as follows: Kroll's testimony: "Q. What did you say about bonuses, if anything? A. I, after interrogating the employee, setting forth the benefits, *I mentioned* that a Christmas bonus in addition to those things enumerated to them, *Christmas bonus* was paid every year, or rather *had been paid every year in the past* and that it was calculated generally on the basis of his annual rate of pay. In the past. except for one year that I previously testified to, that the rate had been 10 percent. that *there was absolutely no .guarantee, nor did the company have any legal liability to pay this bonus. It was simply a gift at Christmastime, and that it had been paid in the past.* And so you must draw your own conclusions as to whether it would be continued. . . ."

Lewald's testimony: "Q. *Is there any guarantee of the bonus at Transpacific?* A. *Absolutely not.* As long as I have been with the company *it's been clearly understood by everybody,* and even to this day, *that the bonus is a gratuity,* and if the parent company's results permit. we may get it, and it may vary and we may not get it; *so it's nothing that we can count upon.*"

Employee Leyton's testimony: "Q. At the time you were hired Mr. Kroll said the bonus had been paid in the past; is that correct? A. And it was his hope that—and it was the company's hope that it would be paid in the future. Q. *Did he also say there was no guarantee that it would be paid in the future?* A. Yes, he did." (Italics added.)

Thus. contrary to the assertion of the dissent, explanations given to the prospective employees concerning the nature of the bonus could not have been more explicit.

139 A.L.R. 1032]; *Hilltop Properties* v. *State of California* (1965) 233 Cal.App.2d 349, 364 [43 Cal.Rptr. 605, 37 A.L.R.3d 109]; 1 Witkin, Summary of Cal. Law, *supra,* § 190, p. 175).

In the instant case, the record conclusively shows that Transpacific had made no promise as to future bonuses, therefore the doctrine of promissory estoppel is inapplicable as a matter of law. Since a brief analysis of the requested special findings demonstrates that they purported to establish primarily the necessary ingredients of promissory estoppel, appellant's contention that the trial court committed prejudicial error by refusing to make special findings on the issues listed therein must automatically fail.

Although the foregoing analysis is determinative of appellant's claim based on promissory estoppel, we parenthetically note that the trial court's failure to make special findings on the issues requested must be held harmless beyond any doubt for two major additional reasons. ■ One, the law is well settled that if findings are made on issues that determine the case, other issues become immaterial and a failure to make additional findings does not constitute prejudicial error (*J. C. Wattenbarger & Sons* v. *Sanders* (1963) 216 Cal.App.2d 495, 505 [30 Cal.Rptr. 910]; *Berk* v. *Twentynine Palms Ranchos, Inc.* (1962) 201 Cal.App.2d 625, 634 [20 Cal.Rptr. 144]). As discussed before, in the case at bench the trial court did make such a determinative finding and as a consequence its failure to make additional findings on immaterial issues must be deemed entirely harmless. Two, it is well recognized that a failure to find is also harmless, when under the facts of the case the finding necessarily would have been adverse to the appellant (*McCullough* v. *Jones* (1970) 11 Cal.App.3d 270, 275 [89 Cal.Rptr. 646]; see also *Capaldi* v. *Levy* (1969) 1 Cal.App.3d 274, 284 [81 Cal.Rptr. 629]). The overwhelming evidence in this case not only shows that no promise as to future bonuses had been made, but also indicates that the assignors had not been induced by the prospect of bonuses to accept the employment with respondent and/or to remain in its employ until their discharge on November 30, 1970. This, of course, means that an eventual finding on the second major element of promissory estoppel (i.e., inducement or reliance) would have been necessarily adverse to appellant.

The remaining issues raised in the briefs of the parties require but a short discussion. The dispute as to the time when the right to a bonus vests in the employee becomes immaterial in view of our holding that at

no time did respondent make any promise to pay future bonuses to the assignors. The contention that the trial court should have made separate findings as to each assignor must fail for the palpable reason that appellant did not submit such a request to the trial court. Finally, we note that the elements of an implied in fact agreement and promissory estoppel call for factual determination and can be adjudicated only on an ad hoc basis, by taking into consideration the peculiar facts presented by the individual case. Therefore, the cases relied upon by appellant have but little precedent value and do not govern the outcome of the instant case.

The judgment is affirmed.

Rouse, J., concurred.

**TAYLOR, P. J.**—I respectfully dissent. Admittedly, the payment of the bonus was tied to the company's financial fortunes and was not guaranteed by the employer. However, in the year in question, *the bonus was paid regardless of the length of tenure* to those in employment on December 15, two weeks after the assignors-employees' blameless termination. Viewed in a light most favorable to the employer, the record here indicates at least some uncertainty in the explanations given to each of the employees on the nature of the bonus, i.e., when it was to vest and whether it was in the nature of compensation for services.

It is to be noted in this latter respect that the employer subjected the bonus to federal withholding tax and social security payments and was, therefore, eligible to deduct these payments in arriving at its own taxable net income. This has been held to indicate intent to pay compensation rather than make a gift (*Willkie* v. *Commissioner of Internal Revenue* (6th Cir. 1942) 127 F.2d 953).[1]

It seems anomalous that an employer would adopt a policy denying this bonus to those, terminated through no fault of their own, who had

---

[1]An employer is required to withhold income and social security tax only from wages (26 C.F.R. §§ 31.3102-3, 31.3401(a)-1); the name used by the employer is immaterial, as bonuses are wages if paid as compensation for services performed. In determining whether a bonus is compensation or a gift, in addition to the tax statutes, the federal courts consider the consistency or regularity of payments, the uniformity in the amount of the payments, the relationship between the amount of the bonus and the remuneration of the recipient, and the financial condition of the employer (*Radio Television Technical School, Inc.* v. *N.L.R.B.* (3d Cir. 1973) 488 F.2d 457, 460).

been employed continuously for almost the entire year to within two weeks of the bonus' declaration and at the same time allow the bonus to those not terminated, who may have worked only a few months before its declaration.

We should not discourage the salutary practice of paying employees bonuses that do not constitute payment for services. However, when this is done, it should be incumbent upon the employer to clarify the precise status and terms of eligibility for these payments. This is particularly demanded where the employer refers to the bonus in urging people to accept or continue employment, as in this case (*Chinn* v. *China Nat. Aviation Corp.,* 138 Cal.App.2d 98, 99-100 [291 P.2d 91]).