In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 05-1786

NISSAN NORTH AMERICA,
INCORPORATED,

*Plaintiff-Appellant,*

*v.*

JIM M'LADY OLDSMOBILE,
INCORPORATED d/b/a JIM
M'LADY NISSAN,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 1290—**Joan B. Gottschall,** *Judge.*

———————

ARGUED JUNE 5, 2006—DECIDED MAY 11, 2007

———————

Before BAUER, ROVNER and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* In this successive appeal, Nissan North America, Inc. ("Nissan") challenges the district court's grant of summary judgment in favor of Jim M'Lady Oldsmobile d/b/a/ Jim M'Lady Nissan ("M'Lady").[1] The first time the case was before us, we vacated the district court's order compelling arbitration,

———————

[1] We will use "M'Lady" to refer to the dealership and "Jim M'Lady" to refer to the individual who was the principal owner and president of the M'Lady dealership at all relevant times.

finding that Nissan had failed to produce sufficient evidence of arbitrability and the court had not given M'Lady an adequate opportunity to rebut Nissan's evidence. *See Nissan North America, Inc. v. Jim M'Lady Oldsmobile, Inc., d/b/a Jim M'Lady Nissan*, 307 F.3d 601 (7th Cir. 2002) (hereafter "*Nissan I*"). With the benefit of a more developed record on remand, the district court found that Nissan failed to demonstrate that it was entitled to arbitration and entered judgment in favor of M'Lady. We affirm.

**I.**

Because the record is considerably more developed than when last we visited this dispute, we recount the relevant facts anew. *See Nissan I*, 307 F.3d at 602-03. Nissan filed this suit to compel arbitration of a dispute regarding Nissan's termination of M'Lady's car dealership. In 1992, Nissan and M'Lady entered into a written dealership contract that allowed M'Lady to operate as an authorized dealer of Nissan cars and trucks. This initial agreement, titled "Nissan Dealer Term Sales & Service Agreement," (hereafter "Dealer Agreement") was set to expire on April 1, 1995. The Dealer Agreement specified that it would automatically terminate at the end of the stipulated term without any action by either party. Another provision required that any amendments be made in a writing executed by both parties. In 1994, the parties extended the termination date to November 1, 1996 by executing "Amendment No. 1 to Nissan Dealer Term Sales and Service Agreement." Second and third amendments effected changes to certain terms of the Dealer Agreement that are not at issue here, but did not modify the termination date. November 1, 1996 came and went without the parties signing any extension to the Dealer Agreement. Until May 1998, M'Lady continued operating as a dealer of

Nissan products without a written contract in place to govern the parties' relationship.

On May 8, 1998, the parties entered into "Amendment No. 4 to Nissan Dealer Term Sales and Service Agreement" ("Amendment 4"). Amendment 4 changed the expiration date of the Dealer Agreement to May 1, 1999 and changed certain deadlines for M'Lady to complete construction of an exclusive Nissan showroom. To effect the latter of these changes, "Article Twelfth" of the original Dealer Agreement was amended to provide that M'Lady would (1) submit for Nissan's approval plans for the construction of the new showroom by July 1, 1998; (2) submit to Nissan a signed contract for the construction of the showroom by September 1, 1998; (3) commence construction of the new showroom by November 1, 1998; and (4) complete construction of the new showroom by May 1, 1999. Amendment 4 also contained a provision subjecting the parties to binding arbitration as the "exclusive mechanism for resolving any dispute, controversy or claim arising out of or relating in any way to this agreement and Amendment No. 4, including but not limited to claims under any state or federal statutes (hereinafter "Disputes")." All Disputes were to be submitted to the independent arbitration service JAMS/ENDISPUTE unless arbitration was waived in writing by both parties. Amendment 4 marked the first time the parties agreed to arbitration.

On April 14, 1999, two weeks before the Dealer Agreement was set to expire, Nissan sent M'Lady a "Notice of Default," charging M'Lady with failing to meet three of the four Amendment 4 deadlines for constructing the exclusive Nissan showroom. The Notice of Default required M'Lady to either complete the showroom within sixty days or provide a commitment within sixty days to complete the showroom in an acceptable amount of time. If M'Lady failed to complete these new requirements within sixty days, Nissan stated it would consider the Dealer Agree-

ment to be in breach and that this breach "may result in Nissan issuing a Notice of Termination" under the relevant provisions of the Dealer Agreement. This was a curious threat given that the agreement was set to expire on its own terms approximately two weeks later, on May 1, 1999. On May 17, 1999, M'Lady responded to the Notice of Default by explaining that a lawsuit with its landlord delayed construction, that the suit had been resolved six months earlier and that M'Lady had since contracted with an architect to begin the planning process for the new facility. M'Lady hoped to have a final set of plans by August 1999 and planned to begin construction by the end of 1999 or the spring of 2000.[2] Nissan responded on June 25, 1999, by offering "an additional period to substantially correct [M'Lady's] failure to fulfill its responsibilities under Article Twelfth (d) of the Agreement with respect to the new exclusive Nissan Showroom." The June 25th letter offered "an additional one hundred-eighty (180) day extension, expiring on December 14, 1999, upon which to either commence construction or provide Nissan with a new Nissan Exclusive Showroom Facility." Nothing in this letter addressed the larger issue of the expiration of the Dealer Agreement and its amendments.

M'Lady apparently did not meet the new deadlines set by the June 25th letter, and Nissan consequently sent a "Notice of Termination Pursuant to the Nissan Dealer Sales and Service Agreement and Chapter 815, Sections 710 et seq. of the Illinois Compiled Statutes" (hereafter "Notice of Termination") on January 19, 2000. This letter purported to terminate the Dealer Agreement and also to

---

[2] M'Lady's May 17th letter began by stating, in relevant part, "As you are aware, Jim M'Lady Nissan has agreed to provide an extensive showroom area for our Nissan line to fulfill our original agreement." The letter then explained the cause of the delays and a new tentative schedule for the showroom.

terminate M'Lady as a dealer, effective sixty days from receipt of the letter. The Notice of Termination directed M'Lady, among other things, to stop selling Nissan products, and to remove the Nissan name and trademark from the dealership, including from all signs and all advertising materials.

Jim M'Lady met with representatives of Nissan on April 14, 2000, and informed them that he was trying to sell the Nissan dealership. As a result, on May 8, 2000, Nissan sent M'Lady a letter that purported to extend the effective date of the termination by ninety days to give M'Lady an opportunity to complete negotiations and to present an acceptable buy-sell agreement to Nissan. Specifically, the letter stated, "Nissan will extend the Notice of Termination and stay the effective date of termination for 90 days commencing from the April 14, 2000 meeting, to and including July 14, 2000, to provide you an opportunity to submit an acceptable proposed transfer of assets." Again, there was no mention of the expiration of the Dealer Agreement and its amendments.

The next correspondence between the parties was a letter from Nissan to M'Lady on June 27, 2000, offering four possible scenarios to resolve the parties' dispute. The first option, which Nissan labeled the status quo, was that M'Lady would provide a proposal to sell the dealership to a buyer acceptable to Nissan by July 14, 2000. If M'Lady failed to present an acceptable buyer candidate by July 14, 2000, under the second option, Nissan would proceed with termination. Under the third option, M'Lady would agree to enter into a new dealer term sales and service agreement, which would entail M'Lady removing the Oldsmobile and Isuzu lines from the premises and providing an exclusive Nissan dealership. The fourth option was the one on which the parties reached some agreement. Under the fourth option, Nissan agreed to further extend the "effective date of termination," listed

as July 14, an additional ninety days in order to provide M'Lady an opportunity to accomplish one of three things: (1) M'Lady would submit a proposal to sell the dealership to a buyer acceptable to Nissan; (2) if no acceptable buyer was procured, M'Lady would remove all other lines, including Oldsmobile and Isuzu, from the dealership premises within 180 days after July 14th; or (3) if M'Lady failed to procure a buyer and also failed to remove the other lines from his dealership, M'Lady would "Voluntarily Terminate." M'Lady "reluctantly accept[ed]" scenario four in a letter faxed to Nissan on July 6, 2000.

In early August 2000, Nissan sent M'Lady a draft Amendment 5. Amendment 5 proposed extending the "Expiration Date" in the final article of the Dealer Agreement to January 8, 2001. It also required M'Lady to find a buyer for the dealership by October 1, 2000 or remove the Oldsmobile and Isuzu lines by January 1, 2001. Finally, Amendment 5 stated that the parties would resolve any disputes arising out of the Dealer Agreement, including Amendment 5, through mediation and binding arbitration. M'Lady did not respond to Nissan's request to execute Amendment 5, and Nissan sent M'Lady a letter on August 18, 2000, asking M'Lady again to sign the new terms and informing M'Lady that it would revoke the offer and pursue termination unless M'Lady complied. M'Lady responded with an August 22, 2000 letter declining Amendment 5 and specifically objecting to, among other things, the arbitration clause. Nissan then revised Amendment 5 to eliminate the arbitration provision but M'Lady declined to sign the new draft as well.

On October 3, 2000, Nissan sent M'Lady a letter (hereafter "Final Termination Letter") setting forth its version of the sequence of events up to that date. Nissan opined that M'Lady breached the Dealer Agreement in a manner that warranted termination of the Dealer Agreement. Nissan thus considered the Dealer Agreement to be "rescinded."

> Nissan hereby gives Dealer notice of its intent to terminate Dealer pursuant to Section 12.A, effective thirty (30) days from Dealer's receipt of this Notice. Please be further advised that Dealer had a right to file a written protest with the Illinois Motor Vehicle Board within thirty (30) days of receipt on January 22, 2000 of Nissan's Notice of Termination dated January 19, 2000. Since Dealer has not filed any such written protest, Nissan refers Dealer to and incorporates herein by reference Nissan's Termination Requirements set forth on Pages 3 and 4 in its Notice of Termination dated January 19, 2000.

M'Lady then filed a Notice of Protest under the Illinois Motor Vehicle Franchise Act with the Illinois Motor Vehicle Review Board (hereafter "Board") on October 20, 2000. On the form cover sheet for the Notice of Protest, M'Lady listed the "Date of current franchise/service agreement" as "5/21/92, amended 9/12/94, 9/27/94, 4/27/95, 5/18/98." In an attached description of the alleged violation, M'Lady charged that Nissan notified M'Lady of its intention to terminate the Dealer Agreement for the reasons stated in Nissan's October 3, 2000 letter, that the facts asserted in the letter were in error, that there was no good cause to terminate the Dealer Agreement, and that Nissan was barred from terminating the Dealer Agreement by reason of its own conduct.

On November 17, 2000, Nissan submitted the dispute to JAMS/ENDISPUTE, citing the arbitration provision of Amendment 4. A few days later, Nissan moved to stay the proceedings with the Board so that the arbitration could proceed. The Board denied the motion to stay and Nissan then filed this action in federal court to compel arbitration. The district court originally granted Nissan's petition to compel arbitration, a decision we vacated in our first opinion in this matter. *See Nissan I*, 307 F.3d at 605. Given the procedural posture of the case at the time, we

remanded so that the record could be more fully developed. After the parties further developed the record on remand, the district court entertained cross-motions for summary judgment. The court found that Amendment 4, the only agreement to arbitrate, had expired in 1999, and thus did not govern the parties' current relationship. Accordingly the district court granted M'Lady's motion for summary judgment, denied Nissan's petition to compel arbitration, and denied Nissan's motion for summary judgment on its petition to compel arbitration. Nissan appeals.

## II.

Nissan raises four arguments on appeal, each a variation on the theme that Amendment 4 continues to govern the parties' relationship. First, Nissan contends that, contrary to M'Lady's representations to this court in the prior appeal, the parties did not form an oral agreement that expressly abandoned Amendment 4. Second, Nissan maintains that because M'Lady filed a protest with the Board to enforce the Dealer Agreement, M'Lady is now estopped from repudiating the arbitration clause in Amendment 4. Third, Nissan argues that it repeatedly waived the expiration of the Dealer Agreement and that M'Lady should be estopped from denying those waivers. Finally, Nissan alleges that the parties impliedly agreed to extend the Dealer Agreement.

We review *de novo* the district court's grant of summary judgment, viewing the facts and all reasonable inferences drawn from those facts in the light most favorable to the party opposing judgment, in this case Nissan. *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir. 2004). Nissan brought its petition to compel arbitration under 9 U.S.C. § 4, which provides:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

As we noted in our prior opinion, under the plain language of this provision, agreements to arbitrate must be in writing. *Nissan I*, 307 F.3d at 604-05; *see also IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524, 529 (7th Cir. 1996). In the first appeal, Nissan pointed to Amendment 4, which contained an expiration date of May 1, 1999, as the relevant written agreement to arbitrate. But we also noted that "a contract that by its own terms expired in 1999 cannot possibly be the basis of the parties' current dealership arrangement, and thus the termination of the current relationship cannot, at least absent additional evidence, be said to relate in any way to the expired contract." *Nissan I*, 307 F.3d at 604. We rejected Nissan's argument that Amendment 4 never expired because Nissan repeatedly waived the expiration date, finding that there was no evidence in the record that M'Lady accepted Nissan's offers to extend the expiration date. *Id*. In the alternative, Nissan argued that although Amendment 4 expired, the parties continued to operate under an identical agreement as evidenced by the parties' course of dealing. Because this agreement was not in writing, we declined to accept it as the writing required by 9 U.S.C. § 4. M'Lady argued that it had not been allowed to present evidence of the parties' post-expiration oral agreement and we remanded so that the record could be further developed on the issue of a written agreement to arbitrate.

Nissan has failed again to demonstrate that the parties had a written agreement to arbitrate that covered the subject of the termination dispute. Nissan's first argument is that M'Lady failed to show on remand that the parties formed an oral agreement that specifically abandoned the terms of Amendment 4. This argument misses the mark, though, because M'Lady's only burden on summary judgment was to demonstrate that Amendment 4, the written agreement to arbitrate, expired and that there was no subsequent written agreement governing the parties' relationship that contained an arbitration clause. True, the parties continued to conduct business after May 1, 1999. Nissan continued to supply the M'Lady dealership with cars and trucks, and M'Lady continued to sell Nissan cars and trucks. Some kind of agreement governed the relationship but there is no evidence that part of that agreement was a promise to arbitrate any disputes. The references to an oral agreement by both this court and by M'Lady in the prior appeal were merely shorthand for whatever unwritten agreement arose subsequent to the expiration of Amendment 4. The salient fact is that there is no evidence of a written agreement to arbitrate that survived the expiration of Amendment 4. M'Lady's failure to prove the terms of any oral agreement is irrelevant to that issue, especially in light of the provision in the Dealer Agreement requiring that all modifications to the contract be in a writing signed by both parties.

Nissan next contends that M'Lady is estopped from repudiating the arbitration clause in Amendment 4 because M'Lady listed Amendment 4, along with the date of the original contract and the dates of all of the other amendments, on the Notice of Protest form on a line requesting the "Date of current franchise/service agreement." Nissan complains that M'Lady was accepting the benefit of Amendment 4 by naming it in the protest and thus is estopped from denying the continuing vitality of

Amendment 4. As M'Lady points out, this is the agreement that Nissan purported to terminate in its Final Termination Letter. M'Lady's protest simply mirrored that letter. M'Lady made no substantive admission that Amendment 4 remained in effect. The franchise relationship between Nissan and M'Lady following the expiration of Amendment 4 was governed by some other agreement as we noted above; we need not concern ourselves with the terms of that agreement or how it was formed except to say that Nissan has failed to produce a written arbitration agreement covering that period of time. It was the franchise relationship that M'Lady sought to protect in the protest, not the expired Amendment 4. Nissan protests that franchise agreements must be in writing and that M'Lady would have had no franchise to protect had it not invoked Amendment 4. Illinois law appears to permit oral franchise agreements, however. *See* 815 ILCS 710/2(i). But even if oral franchise agreements are unenforceable under Illinois law, that fact is irrelevant to the dispute we have before us, which is whether these parties had a written agreement to arbitrate. Without such an agreement, it is for the Board to decide whether M'Lady has enforceable franchise rights.

We similarly reject Nissan's claim that M'Lady is estopped from denying the continuing validity of Amendment 4 because Nissan repeatedly waived the expiration of the Dealer Agreement. In our prior opinion, we tentatively rejected this argument for two reasons. First, although Nissan produced a number of letters it sent to M'Lady offering to extend certain dates, it produced no evidence that M'Lady accepted those offers. *Nissan I*, 307 F.3d at 604. In this second appeal, Nissan has yet to demonstrate that M'Lady accepted any of these offers. Second, we noted that some of the letters on which Nissan relies contain offers to forbear early termination of the contract based on M'Lady's purported breaches rather than offers to extend

the term of the Dealer Agreement. *Nissan I*, 307 F.3d at 604. Nothing in the record as it is now developed changes our view. M'Lady did not accept any offers to extend the term of the Dealer Agreement. Instead, as Nissan acknowledged in its own internal correspondence, after May 1, 1999, M'Lady was running the franchise without the benefit of a written agreement. We thus reject any claim of estoppel.

Finally, Nissan argues that the parties impliedly agreed to extend the term of the Dealer Agreement. Nissan contends that the continued performance of an expired agreement is sufficient to show that the parties impliedly agreed to extend that agreement. The parties squabble about whether the question of implied contract is governed by Illinois or California law. Nissan urges us to use California law. The Dealer Agreement provided that the contract was to be deemed "to have been entered into in the State of California, and all questions concerning the validity, interpretation or performance of any of its terms or provisions, or of any rights or obligations of the parties hereof, shall be governed by and resolved in accordance with the internal laws of the State of California, including, without limitation, the statute of limitations." Under California law, the existence and terms of an implied contract are manifested by conduct rather than words. Cal. Civ. Code 1621. M'Lady argues that because the Dealer Agreement had expired, the federal courts should apply Illinois choice of law rules and use Illinois law to determine the existence and terms of any agreement that arose subsequent to the Dealer Agreement. Like California, Illinois law also recognizes contracts which owe their existence to and whose terms are defined by the parties' conduct or actions. *Brody v. Finch University of Health Sciences/The Chicago Medical School*, 698 N.E.2d 257, 265 (Ill. App. Ct. 1998).

Under either Illinois or California law, we find that Nissan has failed to demonstrate the existence of an implied agreement to extend the expiration date of the Dealer Agreement as amended by Amendment 4. Under both California and Illinois law, in order to prove an implied contract, Nissan must prove the same elements as an express contract. *See Division of Labor Law Enforcement v. Transpacific Transportation Co.*, 137 Cal. Rptr. 855, 859 (Cal. Ct. App. 1977) ("As to the basic elements, there is no difference between an express and implied contract."); *Brody*, 698 N.E.2d at 265 ("A contract implied in fact contains all of the elements of an express contract as well as a meeting of the minds."). That is, Nissan must show offer, acceptance and consideration. *Brody*, 698 N.E.2d at 265; *Transpacific*, 137 Cal. Rptr. at 855. Both Illinois and California emphasize that the plaintiff must show a mutual intent to contract, a meeting of the minds. *Brody*, 698 N.E.2d at 265 (an implied contract arises where "circumstances under common understanding show a mutual intent to contract"); *Transpacific*, 137 Cal. Rptr. at 855 ("the very heart of this kind of agreement is an intent to promise").

To show this intent to extend the expiration date of the Dealer Agreement and Amendment 4, Nissan relies heavily on the fact that the parties continued to do business after the expiration of Amendment 4, and continue to do business together to this day. Nissan also notes that Jim M'Lady indicated after the May 1, 1999 expiration date that he still intended to provide the exclusive Nissan showroom referenced in Amendment 4. Nissan's argument would render meaningless the provision of the Dealer Agreement that required all changes to the agreement to be made in a writing signed by both parties. There is no evidence that the parties ever agreed to alter that requirement to allow oral modifications or modifications implied in fact. The uncontested evidence reveals there

is no written modification extending the Dealer Agreement beyond the expiration date contained in Amendment 4. The sole California case on which Nissan relies for its argument that continued performance establishes an implied extension to the original agreement makes no mention of a contract term requiring modifications to be made in writing. *See British Motor Car Distributors, Ltd. v. New Motor Vehicle Board*, 239 Cal. Rptr. 280 (Cal. Ct. App. 1987). Because the Dealer Agreement contained a provision requiring modifications to be made in writing, we find the *British Motor Car* case to be inapposite.

More importantly, Nissan here is confusing the existence of an implied agreement with the terms of such an agreement. As we noted above, after the expiration of Amendment 4, Nissan continued to provide cars and trucks to M'Lady and M'Lady continued to sell those products while using the Nissan name in the dealership. Even if we assume that a contractual relationship can be implied from that conduct, there is no indication in any of the uncontested evidence that either party agreed to extend the agreement to arbitrate beyond the expiration date of Amendment 4. Indeed, all of the available evidence points to the contrary. Amendment 4 marked the first time the parties agreed to resolve their disputes through binding arbitration. When Nissan subsequently proposed an arbitration clause in the draft Amendment 5, M'Lady immediately rejected that term and Nissan prepared a new draft excluding the arbitration clause. In the interim, Nissan indicated its belief in both internal memoranda and in meetings with Jim M'Lady that Amendment 4 had expired on May 1, 1999 and that the parties were subsequently operating without an agreement in effect. Neither party manifested an intent to commit disputes to binding arbitration following the expiration of Amendment 4. Thus, Nissan has failed to demonstrate the existence of an

implied contract that included an arbitration clause among its terms.

## III.

All of Nissan's arguments are variations on the theme that Amendment 4 continued to govern the parties' relationship even after the agreement expired by its own terms. Because we conclude that there is no written agreement containing an arbitration clause that governed the parties' relationship at the time of termination, we affirm the judgment of the district court in every respect.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*