[No. A055685. First Dist., Div. Four. Jan. 19,1993.]

HILDEGARD LEE BORELLI, Plaintiff and Appellant, v.
GRACE G. BRUSSEAU, as Executor, etc., Defendant and Respondent.

## COUNSEL

Fitzgerald, Abbott & Beardsley, Richard T. White, Virginia Palmer and Maria I. Lawless for Plaintiff and Appellant.

Steven B. Piser and Bryce C. Anderson for Defendant and Respondent.

## OPINION

PERLEY, J.—Plaintiff and appellant Hildegard L. Borelli (appellant) appeals from a judgment of dismissal after a demurrer was sustained without leave to amend to her complaint against defendant and respondent Grace G. Brusseau, as executor of the estate of Michael J. Borelli (respondent). The complaint sought specific performance of a promise by appellant's deceased husband, Michael J. Borelli (decedent), to transfer certain property to her in return for her promise to care for him at home after he had suffered a stroke.

Appellant contends that the trial court erred by sustaining the demurrer on the grounds that the "alleged agreement [appellant] seeks to enforce is without consideration and the alleged contract is void as against public policy." We conclude that the contention lacks merit.

FACTS

■ The only "facts" we can consider on this appeal from the sustaining of a demurrer are those "material facts properly pleaded, but not contentions, deductions or conclusions of fact or law." (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) Since both parties' briefs wander far from the allegations of the complaint we will set out those allegations in some detail.

On April 24, 1980, appellant and decedent entered into an antenuptial contract. On April 25, 1980, they were married. Appellant remained married to decedent until the death of the latter on January 25, 1989.

In March 1983, February 1984, and January 1987, decedent was admitted to a hospital due to heart problems. As a result, "decedent became concerned and frightened about his health and longevity." He discussed these fears and concerns with appellant and told her that he intended to "leave" the following property to her.

1. "An interest" in a lot in Sacramento, California.

2. A life estate for the use of a condominium in Hawaii.

3. A 25 percent interest in Borelli Meat Co.

4. All cash remaining in all existing bank accounts at the time of his death.

5. The costs of educating decedent's stepdaughter, Monique Lee.

6. Decedent's entire interest in a residence in Kensington, California.

7. All furniture located in the residence.

8. Decedent's interest in a partnership.

9. Health insurance for appellant and Monique Lee.

In August 1988, decedent suffered a stroke while in the hospital. "Throughout the decedent's August, 1988 hospital stay and subsequent treatment at a rehabilitation center, he repeatedly told [appellant] that he was uncomfortable in the hospital and that he disliked being away from home. The decedent repeatedly told [appellant] that he did not want to be admitted to a nursing home, even though it meant he would need round-the-clock care, and rehabilitative modifications to the house, in order for him to live at home."

"In or about October, 1988, [appellant] and the decedent entered an oral agreement whereby the decedent promised to leave to [appellant] the property listed [above], including a one hundred percent interest in the Sacramento property. . . . In exchange for the decedent's promise to leave her the property . . . [appellant] agreed to care for the decedent in his home, for the duration of his illness, thereby avoiding the need for him to move to a rest home or convalescent hospital as his doctors recommended. The agreement was based on the confidential relationship that existed between [appellant] and the decedent."

Appellant performed her promise but the decedent did not perform his. Instead his will bequeathed her the sum of $100,000 and his interest in the residence they owned as joint tenants. The bulk of decedent's estate passed to respondent, who is decedent's daughter.

### DISCUSSION

"It is fundamental that a marriage contract differs from other contractual relations in that there exists a definite and vital public interest in reference to the marriage relation. The 'paramount interests of the community at large,' quoting from the *Phillips* case [*Phillips* v. *Phillips* (1953) 41 Cal.2d 869] is a matter of primary concern." (*Hendricks* v. *Hendricks* (1954) 125 Cal.App.2d 239, 242 [270 P.2d 80].)

"The laws relating to marriage and divorce (Civ. Code, [former] §§ 55-181) have been enacted because of the profound concern of our organized society for the dignity and stability of the marriage relationship. This concern relates primarily to the status of the parties as husband and wife. The concern of society as to the property rights of the parties is secondary and incidental to its concern as to their status." (*Sapp* v. *Superior Court* (1953) 119 Cal.App.2d 645, 650 [260 P.2d 119].)

"Marriage is a matter of public concern. The public, through the state, has interest in both its formation and dissolution. . . . The regulation of marriage and divorce is solely within the province of the Legislature except as the same might be restricted by the Constitution." (*Haas* v. *Haas* (1964) 227 Cal.App.2d 615, 617 [38 Cal.Rptr. 811].)

In accordance with these concerns the following pertinent legislation has been enacted: Civil Code section 242—"Every individual shall support his or her spouse . . . ." Civil Code section 4802—"[A] husband and wife cannot, by any contract with each other, alter their legal relations, except as to property. . . ." Civil Code section 5100—"Husband and wife contract

toward each other obligations of mutual respect, fidelity, and support." Civil Code section 5103—"[E]ither husband or wife may enter into any transaction with the other . . . respecting property, which either might if unmarried." Civil Code section 5132—"[A] married person shall support the person's spouse while they are living together. . . ."

The courts have stringently enforced and explained the statutory language. █ "Although most of the cases, both in California and elsewhere, deal with a wife's right to support from the husband, in this state a wife also has certain obligations to support the husband." (*In re Marriage of Higgason* (1973) 10 Cal.3d 476, 487 [110 Cal.Rptr. 897, 516 P.2d 289], disapproved on other grounds in *In re Marriage of Dawley* (1976) 17 Cal.3d 342, 352 [131 Cal.Rptr. 3, 551 P.2d 323].)

"Indeed, husband and wife assume mutual obligations of support upon marriage. These obligations are not conditioned on the existence of community property or income." (*See* v. *See* (1966) 64 Cal.2d 778, 784 [51 Cal.Rptr. 888, 415 P.2d 776].) "In entering the marital state, by which a contract is created, it must be assumed that the parties voluntarily entered therein with knowledge that they have the moral and legal obligation to support the other." (*Department of Mental Hygiene* v. *Kolts* (1966) 247 Cal.App.2d 154, 165 [55 Cal.Rptr. 437].)

█ Moreover, interspousal mutual obligations have been broadly defined. "[Husband's] duties and obligations to [wife] included more than mere cohabitation with her. It was his duty to offer [wife] his sympathy, confidence [citation], and fidelity." (*In re Marriage of Rabie* (1974) 40 Cal.App.3d 917, 922 [115 Cal.Rptr. 594].) When necessary, spouses must "provide uncompensated protective supervision services for" each other. (*Miller* v. *Woods* (1983) 148 Cal.App.3d 862, 877 [196 Cal.Rptr. 69].)

*Estate of Sonnicksen* (1937) 23 Cal.App.2d 475, 479 [73 P.2d 643] and *Brooks* v. *Brooks* (1941) 48 Cal.App.2d 347, 349-350 [119 P.2d 970], each hold that under the above statutes and in accordance with the above policy a wife is obligated by the marriage contract to provide nursing-type care to an ill husband. Therefore, contracts whereby the wife is to receive compensation for providing such services are void as against public policy; and there is no consideration for the husband's promise.

█ Appellant argues that *Sonnicksen* and *Brooks* are no longer valid precedents because they are based on outdated views of the role of women and marriage. She further argues that the rule of those cases denies her equal protection because husbands only have a financial obligation toward their

wives, while wives have to provide actual nursing services for free. We disagree. The rule and policy of *Sonnicksen* and *Brooks* have been applied to both spouses in several recent cases arising in different areas of the law.

■  Webster's New Collegiate Dictionary (1981) page 240 defines consortium as "The legal right of one spouse to the company, affection, and service of the other." Only married persons are allowed to recover damages for loss of consortium. (*Elden* v. *Sheldon* (1988) 46 Cal.3d 267, 277 [250 Cal.Rptr. 254, 758 P.2d 582].)

*Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382 [115 Cal.Rptr. 765, 525 P.2d 669], held that a wife could recover consortium damages. The Supreme Court's reasoning was as follows. "But there is far more to the marriage relationship than financial support. 'The concept of consortium includes not only loss of support or services, it also embraces such elements as love, companionship, affection, society, sexual relations, solace and more.' [Citation.] As to each, 'the interest sought to be protected is personal to the wife' [citation] . . . ." (*Rodriguez* v. *Bethlehem Steel Corp.*, *supra*, at pp. 404-405.) "The deprivation of a husband's physical assistance in operating and maintaining the family home is a compensable item of loss of consortium." (*Id.* at p. 409, fn. 31.)

In *Krouse* v. *Graham* (1977) 19 Cal.3d 59, 66-67 [137 Cal.Rptr. 863, 562 P.2d 1022], an action for the wrongful death of the wife, the husband was allowed to recover consortium damages "for the loss of his wife's 'love, companionship, comfort, affection, society, solace or moral support, any loss of enjoyment of sexual relations, or any loss of her physical assistance in the operation or maintenance of the home.' " The wife "had recently retired as a legal secretary in order to care for her husband, Benjamin, whose condition of emphysema, in turn, caused him to retire and necessitated considerable nursing services."

The principal holding of *Watkins* v. *Watkins* (1983) 143 Cal.App.3d 651 [192 Cal.Rptr. 54], was that a marriage did not extinguish a woman's right to recover the value of her homemaker services rendered prior to the marriage. Much of the opinion is devoted to a discussion of *Sonnicksen* and *Brooks*. Those cases are approved by the court but not expanded to cover the period before marriage. (*Id.* at pp. 654-655.)

*Vincent* v. *State of California* (1971) 22 Cal.App.3d 566 [99 Cal.Rptr. 410], held that for purposes of benefit payments spouses caring for each other must be treated identically under similar assistance programs. In reaching such conclusion the court held: "Appellants suggest that one reason

justifying denial of payment for services rendered by ATD attendants who reside with their recipient spouses is that, by virtue of the marriage contract, one spouse is obligated to care for the other without remuneration. (Civ. Code, § 5100; *Estate of Sonnicksen* (1937) 23 Cal.App.2d 475, 479 [73 P.2d 643].) Such preexisting duty provides a constitutionally sound basis for a classification which denies compensation for care rendered by a husband or wife to his spouse who is receiving welfare assistance. [Citations.] . . . [¶] . . . But insofar as one spouse has a duty created by the marriage contract to care for the other without compensation when they are living together, recipients of aid to the aged, aid to the blind and aid to the disabled are similarly situated." (*Vincent* v. *State of California, supra,* at p. 572.)

■ These cases indicate that the marital duty of support under Civil Code sections 242, 5100, and 5132 includes caring for a spouse who is ill. They also establish that support in a marriage means more than the physical care someone could be hired to provide. Such support also encompasses sympathy (*In re Marriage of Rabie, supra,* 40 Cal.App.3d at p. 922) comfort (*Krouse* v. *Graham, supra,* 19 Cal.3d at pp. 66-67) love, companionship and affection (*Rodriguez* v. *Bethlehem Steel Corp., supra,* 12 Cal.3d at pp. 404-405). Thus, the duty of support can no more be "delegated" to a third party than the statutory duties of fidelity and mutual respect (Civ. Code, § 5100). Marital duties are owed by the spouses personally. This is implicit in the definition of marriage as "a personal relation arising out of a civil contract between a man and a woman." (Civ. Code, § 4100.)

We therefore adhere to the long-standing rule that a spouse is not entitled to compensation for support, apart from rights to community property and the like that arise from the marital relation itself. Personal performance of a personal duty created by the contract of marriage does not constitute a new consideration supporting the indebtedness alleged in this case.

We agree with the dissent that no rule of law becomes sacrosanct by virtue of its duration, but we are not persuaded that the well-established rule that governs this case deserves to be discarded. If the rule denying compensation for support originated from considerations peculiar to women, this has no bearing on the rule's gender-neutral application today. There is as much potential for fraud today as ever, and allegations like appellant's could be made every time any personal care is rendered. This concern may not entirely justify the rule, but it cannot be said that all rationales for the rule are outdated.

Speculating that appellant might have left her husband but for the agreement she alleges, the dissent suggests that marriages will break up if such

agreements are not enforced. While we do not believe that marriages would be fostered by a rule that encouraged sickbed bargaining, the question is not whether such negotiations may be more useful than unseemly. The issue is whether such negotiations are antithetical to the institution of marriage as the Legislature has defined it. We believe that they are.

The dissent maintains that mores have changed to the point that spouses can be treated just like any other parties haggling at arm's length. Whether or not the modern marriage has become like a business, and regardless of whatever else it may have become, it continues to be defined by statute as a personal relationship of mutual support. Thus, even if few things are left that cannot command a price, marital support remains one of them.

### DISPOSITION

The judgment is affirmed. Costs to respondents.

Anderson, P. J., concurred.

POCHÉ, J., Dissenting.—A very ill person wishes to be cared for at home personally by his spouse rather than by nurses at a health care facility. The ill person offers to pay his spouse for such personal care by transferring property to her. The offer is accepted, the services are rendered and the ill spouse dies. Affirming a judgment of dismissal rendered after a general demurrer was sustained, this court holds that the contract was not enforceable because—as a matter of law—the spouse who rendered services gave no consideration. Apparently, in the majority's view she had a preexisting or precontract nondelegable duty to clean the bedpans herself. Because I do not believe she did, I respectfully dissent.

The majority correctly read *Estate of Sonnicksen* (1937) 23 Cal.App.2d 475 [73 P.2d 643] and *Brooks* v. *Brooks* (1941) 48 Cal.App.2d 347 [119 P.2d 970] as holding that a wife cannot enter into a binding contract with her husband to provide "nursing-type care" for compensation. (Maj. opn., *ante*, p. 652.) It reasons that the wife, by reason of the marital relationship, already has a duty to provide such care, thus she offers no new consideration to support an independent contract to the same effect. (See Civ. Code, §§ 1550, 1605.) The logic of these decisions is ripe for reexamination.

*Sonnicksen* and *Brooks* are the California Court of Appeal versions of a national theme. (See, e.g., *Bohanan* v. *Maxwell* (1921) 190 Iowa 1308 [181 N.W. 683, 14 A.L.R. 1004]; *Foxworthy* v. *Adams* (1910) 136 Ky. 403 [124 S.W. 381]; *Martinez* v. *Martinez* (1957) 62 N.M. 215 [307 P.2d 1117];

*Ritchie* v. *White* (1945) 225 N.C. 450 [35 S.E.2d 414]; *Oates* v. *Oates* (1945) 127 W.Va. 469 [33 S.E.2d 457].) Excerpts from several of these decisions reveal the ethos and mores of the era which produced them.

" ' "It would operate disastrously upon domestic life and breed discord and mischief if the wife could contract with her husband for the payment of services to be rendered for him in his home; if she could exact compensation for services, disagreeable or otherwise, rendered to members of his family; if she could sue him upon such contracts and establish them upon the disputed and conflicting testimony of the members of the household. To allow such contracts would degrade the wife by making her a menial and a servant in the home where she should discharge marital duties in loving and devoted ministrations, and frauds upon creditors would be greatly facilitated, as the wife could frequently absorb all her husband's property in the payment of her services, rendered under such secret, unknown contracts." ' " (*Brooks* v. *Brooks*, *supra*, 48 Cal.App.2d 347 at p. 350 [quoting *Coleman* v. *Burr* (1883) 93 N.Y. 17, 25]; accord, *Bohanan* v. *Maxwell*, *supra*, 181 N.W. 683 at p. 687.)

"A man cannot be entitled to the services of his wife for nothing, by virtue of a uniform and unchangeable marriage contract, and at the same time be under obligation to pay her for those services . . . . She cannot be his wife and his hired servant at the same time. . . . That would be inconsistent with the marriage relation, and disturb the reciprocal duties of the parties." (*In re Callister's Estate* (1897) 153 N.Y. 294 [47 N.E. 268, 270].)

"[I]t is not within the power of husband and wife to contract with each other for the payment for such services . . . . It is the duty of husband and wife to attend, nurse, and care for each other when either is unable to care for himself. It would be contrary to public policy to permit either to make an enforceable contract with the other to perform such services as are ordinarily imposed upon them by the marital relations, and which should be the natural prompting of that love and affection which should always exist between husband and wife." (*Foxworthy* v. *Adams*, *supra*, 124 S.W. 381 at p. 383.)

Statements in two of these cases to the effect that a husband has an entitlement to his wife's "services" (e.g., *In re Callister's Estate*, *supra*, 47 N.E. 268 at pp. 269-270; *Ritchie* v. *White*, *supra*, 35 S.E.2d 414 at pp. 416-417) smack of the common law doctrine of coverture which treated a wife as scarcely more than an appendage to her husband. According to the United States Supreme Court, "At the common law the husband and wife were regarded as one. The legal existence of the wife during coverture was merged in that of the husband, and, generally speaking, the wife was

incapable of making contracts, of acquiring property or disposing of the same without her husband's consent. They could not enter into contracts with each other, nor were they liable for torts committed by one against the other." (*Thompson* v. *Thompson* (1910) 218 U.S. 611, 614-615 [54 L.Ed.2d 1180, 1181, 31 S.Ct. 111]; see 1 Blackstone's Commentaries 442; 2 Blackstone's Commentaries 433.) The same court subsequently denounced coverture as "peculiar and obsolete" (*United States* v. *Yazell* (1966) 382 U.S. 341, 351 [15 L.Ed.2d 404, 404, 86 S.Ct. 500]), "a completely discredited . . . archaic remnant of a primitive caste system" (*id.* at p. 361 [15 L.Ed.2d at p. 415] (dis. opn. of Black, J.)) founded upon "medieval views" which are at present "offensive to the ethos of our society." (*United States* v. *Dege* (1960) 364 U.S. 51, 52-53 [4 L.Ed.2d 1563, 1564-1565, 80 S.Ct. 1589].) One of the characteristics of coverture was that it deemed the wife economically helpless and governed by an implicit exchange: " 'The husband, as head of the family, is charged with its support and maintenance, in return for which he is entitled to the wife's services in all those domestic affairs which pertain to the comfort, care, and well-being of the family. Her labors are her contribution to the family support and care.' " (*Ritchie* v. *White, supra,* at pp. 416-417 [citation omitted].) But coverture has been discarded in California (see 11 Witkin, Summary of Cal. Law (9th ed. 1990) Husband and Wife, § 1, p. 13), where both husband and wife owe each other the duty of support. (Civ. Code, §§ 242, 5100, 5132.)

Not only has this doctrinal base for the authority underpinning the majority opinion been discarded long ago, but modern attitudes toward marriage have changed almost as rapidly as the economic realities of modern society. The assumption that only the rare wife can make a financial contribution to her family has become badly outdated in this age in which many married women have paying employment outside the home. A two-income family can no longer be dismissed as a statistically insignificant aberration. Moreover today husbands are increasingly involved in the domestic chores that make a house a home. Insofar as marital duties and property rights are not governed by positive law, they may be the result of informal accommodation or formal agreement. (See Civ. Code, § 5200 et seq.) If spouses cannot work things out, there is always the no longer infrequently used option of divorce. For better or worse, we have to a great extent left behind the comfortable and familiar gender-based roles evoked by Norman Rockwell paintings. No longer can the marital relationship be regarded as "uniform and unchangeable." (*In re Callister's Estate, supra,* 47 N.E. 268 at p. 270.)

It is true that public policy seeks to foster and protect that institution (*Glickman* v. *Collins* (1975) 13 Cal.3d 852, 857 [120 Cal.Rptr. 76, 533 P.2d 204, 93 A.L.R.3d 513]) in recognition that the structure of society itself

depends in large part upon the institution of marriage (*Marvin* v. *Marvin* (1976) 18 Cal.3d 660, 684 [134 Cal.Rptr. 815, 557 P.2d 106]). Yet the recognition that marriage is "intimate to the degree of being sacred" (*Griswold* v. *Connecticut* (1965) 381 U.S. 479, 486 [14 L.Ed.2d 510, 516, 85 S.Ct. 1678]) does not mean that the law is oblivious to what occurs within that relationship. Solicitude for domestic harmony is no longer synonymous with blindness to crimes spouses commit against each other (see *People* v. *Pierce* (1964) 61 Cal.2d 879 [40 Cal.Rptr. 845, 395 P.2d 893]), even when those crimes involve the previously sacrosanct realm of sexual relations. (See Pen. Code, § 262.) Similarly, civil actions are allowed for intentional or negligent torts committed by one spouse against the other. (See Civ. Code, § 5113; *Klein* v. *Klein* (1962) 58 Cal.2d 692 [26 Cal.Rptr. 102, 376 P.2d 70]; *Self* v. *Self* (1962) 58 Cal.2d 683 [26 Cal.Rptr. 97, 376 P.2d 65].)[1] The same is true for breached contracts. (See *Wilson* v. *Wilson* (1868) 36 Cal. 447; *In re Marriage of McNeill* (1984) 160 Cal.App.3d 548 [206 Cal.Rptr. 641].) Thus, when the simple justice of redressing obvious wrongs is involved, the arguments for domestic harmony have been rejected and are now in full retreat, not only in California (see *Gibson* v. *Gibson, supra,* 3 Cal.3d 914 at pp. 917-920 and authorities cited), but throughout the entire nation. (See, e.g., Harper et al., The Law of Torts (2d ed. 1986) §§ 8.10-8.11, pp. 562-569, 573-578; Prosser & Keeton on Torts (5th ed. 1984) § 122, pp. 902-906; Rest.2d Torts, § 895F, com. f.)

Restraints on interspousal litigation are almost extinct. With the walls supposedly protecting the domestic haven from litigation already reduced to rubble, it hardly seems revolutionary to topple one more brick. Furthermore, in situations such as this, where one spouse has died, preserving " 'domestic life [from] discord and mischief' " (*Brooks* v. *Brooks, supra,* 48 Cal.App.2d 347 at p. 350) seems an academic concern that no modern academic seems concerned with.

Fear that a contract struck between spouses "degrades" the spouse providing service, making him or her no better than a "hired servant" justifies the result in several cases. (E.g., *Brooks* v. *Brooks, supra,* 48 Cal.App.2d 347 at p. 350; *In re Callister's Estate, supra,* 47 N.E. 268 at p. 270.) Such fears did not prevent California from enacting a statute specifying that "either husband or wife may enter into any transaction with the other, or with any other person, respecting property, which either might if unmarried." (Civ. Code, §§ 5103, subd. (a), 4802.) This is but one instance of "the utmost freedom of contract [that] exists in California between husband and wife . . . ." (*Perkins* v. *Sunset Tel. and Tel. Co.* (1909) 155 Cal. 712, 720 [103 P. 190].)

---

[1] A related development was the abolition of the comparable immunity granted parents from such suits by their children. (See *Gibson* v. *Gibson* (1971) 3 Cal.3d 914 [92 Cal.Rptr. 288, 479 P.2d 648]; *Emery* v. *Emery* (1955) 45 Cal.2d 421 [289 P.2d 218].)

Reduced to its essence, the alleged contract at issue here was an agreement to transmute Mr. Borelli's separate property into the separate property of his wife.[2] Had there been no marriage and had they been total strangers, there is no doubt Mr. Borelli could have validly contracted to receive her services in exchange for certain of his property. The mere existence of a marriage certificate should not deprive competent adults of the "utmost freedom of contract" they would otherwise possess.

Then there is the concern about "frauds upon creditors." (E.g., *Brooks* v. *Brooks*, *supra*, 48 Cal.App.2d 347 at p. 350.) Our Supreme Court has repeatedly rejected the notion that the mere possibility of interspousal fraud or collusion at the expense of third parties bars an entire category of interspousal litigation. Instead, the truth finding role of the judiciary has been deemed adequate to deal with the problem in individual cases. In other words, whether or not a contract was induced by fraud is decided by not demurrer, but by human beings called jurors after they hear evidence. (See *Klein* v. *Klein*, *supra*, 58 Cal.2d 692 at pp. 694-696; *Emery* v. *Emery*, *supra*, 45 Cal.2d 421 at pp. 431-432; see also *Hoeck* v. *Greif* (1904) 142 Cal. 119 [75 P. 670].) This modern approach completely undercuts one more of the doctrinal underpinnings of *Sonnicksen* and *Brooks* and is obviously applicable here. Since this shift in the law occurred after those cases were decided, it is one more reason to reconsider them and to reject their contemporary force. As Justice Holmes put it: "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past." (Justice Oliver Wendell Holmes, Collected Legal Papers (1920) p. 187.)

No one doubts that spouses owe each other a duty of support or that this encompasses "the obligation to provide medical care." (*Hawkins* v. *Superior Court* (1979) 89 Cal.App.3d 413, 418-419 [152 Cal.Rptr. 491].) There is nothing found in *Sonnicksen* and *Brooks*, or cited by the majority, which requires that this obligation be *personally* discharged by a spouse except the decisions themselves. However, at the time *Sonnicksen* and *Brooks* were decided—before World War II—it made sense for those courts to say that a

---

[2]Plaintiff makes reference in her complaint to a "1980 written antenuptial contract" that she alleges she "signed . . . one day before her wedding." Although the record does not include a copy of this contract, it seems obvious from the context of this litigation that its general import was to segregate and preserve substantial assets as to Mr. Borelli's separate property.

The possibility that the agreement is ineffective to transmute the character of Mr. Borelli's property because of noncompliance with various statute of frauds provisions (see Civ. Code, §§ 1624, 5110.730; Code Civ. Proc., §§ 1971-1972) need not be addressed here in light of plaintiff's allegation that defendants are estopped to claim the benefit of these provisions. (See 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 735, p. 182.)

wife could perform her duty of care only by doing so personally. That was an accurate reflection of the real world for women years before the exigency of war produced substantial employment opportunities for them. For most women at that time there was no other way to take care of a sick husband except personally. So to the extent those decisions hold that a contract to pay a wife for caring personally for her husband is without consideration they are correct only because at the time they were decided there were no other ways she could meet her obligation of care. Since that was the universal reality, she was giving up nothing of value by agreeing to perform a duty that had one and only one way of being performed.

However the real world has changed in the 56 years since *Sonnicksen* was decided. Just a few years later with the advent of World War II Rosie the Riveter became not only a war jingle but a salute to hundreds of thousands of women working on the war effort outside the home. We know what happened thereafter. Presumably, in the present day husbands and wives who work outside the home have alternative methods of meeting this duty of care to an ill spouse. Among the choices would be: (1) paying for professional help; (2) paying for nonprofessional assistance; (3) seeking help from relatives or friends; and (4) quitting one's job and doing the work personally.

A fair reading of the complaint indicates that Mrs. Borelli initially chose the first of these options, and that this was not acceptable to Mr. Borelli, who then offered compensation if Mrs. Borelli would agree to personally care for him at home. To contend in 1993 that such a contract is without consideration means that if Mrs. Clinton becomes ill, President Clinton must drop everything and personally care for her.

According to the majority, Mrs. Borelli had nothing to bargain with so long as she remained in the marriage. This assumes that an intrinsic component of the marital relationship is the *personal* services of the spouse, an obligation that cannot be delegated or performed by others. The preceding discussion has attempted to demonstrate many ways in which what the majority terms "nursing-type care" can be provided without either husband or wife being required to empty a single bedpan. It follows that, because Mrs. Borelli agreed to supply this personal involvement, she was providing something over and above what would fully satisfy her duty of support. That personal something—precisely because it was something she was not required to do—qualifies as valid consideration sufficient to make enforceable Mr. Borelli's reciprocal promise to convey certain of his separate property.

Not only does the majority's position substantially impinge upon couples' freedom to come to a working arrangement of marital responsibilities, it may

also foster the very opposite result of that intended. For example, nothing compelled Mr. Borelli and plaintiff to continue living together after his physical afflictions became known. Moral considerations notwithstanding, no legal force could have stopped plaintiff from leaving her husband in his hour of need. Had she done so, and had Mr. Borelli promised to give her some of his separate property should she come back, a valid contract would have arisen upon her return. Deeming them contracts promoting reconciliation and the resumption of marital relations, California courts have long enforced such agreements as supported by consideration. (E.g., *Bowden* v. *Bowden* (1917) 175 Cal. 711 [167 P. 154]; *Braden* v. *Braden* (1960) 178 Cal.App.2d 481 [3 Cal.Rptr. 120].) Here so far as we can tell from the face of the complaint, Mr. Borelli and plaintiff reached largely the same result without having to endure a separation.[3] There is no sound reason why their contract, which clearly facilitated continuation of their marriage, should be any less valid. It makes no sense to say that spouses have greater bargaining rights when separated than they do during an unruptured marriage.

What, then, justifies the ban on interspousal agreements of the type refused enforcement by *Sonnicksen, Brooks,* and the majority? At root it appears to be the undeniable allure of the thought that, for married persons, "to attend, nurse, and care for each other . . . should be the natural prompting of that love and affection which should always exist between husband and wife." (*Foxworthy* v. *Adams, supra,* 124 S.W. 381 at p. 383.) All married persons would like to believe that their spouses would cleave unto them through thick and thin, in sickness and in health. Without question, there is something profoundly unsettling about an illness becoming the subject of interspousal negotiations conducted over a hospital sickbed. Yet sentiment cannot substitute for common sense and modern day reality. Interspousal litigation may be unseemly, but it is no longer a novelty. The majority preserves intact an anomalous rule which gives married persons less than the utmost freedom of contract they are supposed to possess. The majority's rule leaves married people with contracting powers which are more limited than those enjoyed by unmarried persons or than is justified by legitimate public policy. In this context public policy should not be equated with coerced altruism. Mr. Borelli was a grown man who, having amassed a sizeable amount of property, should be treated—at least on demurrer—as competent

---

[3]Plaintiff's allegation in her complaint that she forewent the opportunity "to live an independent life in consideration of her agreement" with Mr. Borelli carries the clear implication that she would have separated from him but for the agreement.

to make the agreement alleged by plaintiff. The public policy of California will not be outraged by affording plaintiff the opportunity to try to enforce that agreement.

A petition for a rehearing was denied February 17, 1993, and appellant's petition for review by the Supreme Court was denied April 1, 1993. Kennard, J., was of the opinion that the petition should be granted.