[No. A058865. First Dist., Div. Four. Nov. 30, 1993.]

TERRI FRIEDMAN, Plaintiff and Respondent, v.
ELLIOTT FRIEDMAN, Defendant and Appellant.

878

**COUNSEL**

Lawrence A. Gibbs for Defendant and Appellant.

Bernard N. Wolf for Plaintiff and Respondent.

**OPINION**

**ANDERSON, P. J.**—Elliott Friedman (appellant), defendant in a *"Marvin"* action (*Marvin* v. *Marvin* (1976) 18 Cal.3d 660 [134 Cal.Rptr. 815, 557 P.2d 106] [*Marvin I*]), appeals from an order awarding temporary spousal support pending trial to Terri Friedman (respondent), plaintiff in that action. We reverse.

### I. BACKGROUND

#### A. *Procedural History*

On January 13, 1992, respondent filed a complaint, seeking damages and various forms of equitable relief from appellant, following termination of a relationship in which the two had cohabited for twenty-one years. On April 21, 1992, respondent filed a motion, requesting "temporary support" pending trial. The motion was supported by a lengthy declaration by respondent,

chronicling the history of her relationship with appellant. Appellant filed opposition to the motion, including a declaration which contradicted a number of facts set forth in respondent's declaration. The trial court conducted a two-day evidentiary hearing, rendering its decision shortly thereafter.

In its "Statement of Decision on Motion for Temporary Support" the court noted that respondent's motion presented a "compelling" case for an award of (temporary) support "based on an implied contract . . . ." The court found that the evidence presented was insufficient to support a finding of an express agreement to provide support but that it was adequate to support a finding of an "implied" agreement. Specifically, the court found that there was an implied contract between the parties "that if they separated, [respondent] would be supported by [appellant] in the same manner as if they had been legally married."

After finding an implied contract for support, the court examined the question of "whether it is appropriate to make the highly unusual provision for damages to be paid pending trial." The court found that trial could be years in the future, leaving respondent "in poor health living off her dwindling personal assets." The court found that such an award was proper because there were no other adequate remedies, respondent would suffer irreparable injury (if the award were not made) and respondent had a "reasonable probability of success at trial on the merits." Finally, the court awarded $1,426 per month in temporary support, based on Alameda County spousal support guidelines.

Apparently in response to appellant's request, the court issued a "Further Statement of Decision." This statement expanded the court's earlier findings on the issues of irreparable harm and inadequacy of legal remedies. On the question of irreparable harm, the court found that "injunctive relief" was required because respondent was totally physically disabled and had only modest liquid savings to use to "support her daily needs and to maintain her mortgage, insurance and real property tax payments . . . ." On the question of the inadequacy of monetary damages the court reiterated that trial might be years in the future. A formal "Order for Temporary Support" was then entered which ordered appellant to pay the sum of $1,426 per month, beginning April 21, 1992, until the time of trial or further order of the court.

Shortly thereafter appellant filed a motion to dissolve injunction and, in the alternative, to fix the amount of security for undertaking. During the course of that hearing, the court noted that its original order, indeed, had been framed as an injunctive order. However, the court ultimately "changed

[its] mind" and denied "appellant's motion to dissolve injunction and to require security" because the earlier order was *not* an injunctive order but rather, an "order to pay money . . . ."

## B. *Factual Background*

The evidence presented at the original hearing on the motion for temporary support consisted of the declarations of the parties filed in support of and in opposition to the motion, as well as testimony from appellant and respondent. The evidence presented very few factual conflicts.

### (1) *History of Relationship*

Respondent and appellant began living together in 1967, when respondent was 25 years old. Respondent had a child from a previous marriage when she and appellant began their cohabitation. Respondent and appellant did not believe that a license for marriage was necessary to bond together in a lifetime commitment. Thus, they vowed to be husband and wife and to strive to be partners in all respects "without any sanction by the State."

In 1971 respondent and appellant purchased land in Alaska in partnership with several other individuals; title to their portion referred to them as "Husband and Wife." Over a period of two years, they built a home on their property. Appellant worked as an investigator the entire time they were in Alaska. Respondent initially worked as a waitress; however, her principal work was in contributing to appellant's career, building up and maintaining the property, and caring for their first child, who was born in 1974. Along the way they also acquired an interest in some commercial property, the deed to which listed respondent as "Terri Friedman." When they decided to leave Alaska that property was sold.

In 1978 or 1979 respondent and appellant moved back to the Bay Area; appellant began attending law school in 1979. Their plans for respondent to complete her college education fell through in part due to illness of their second child, who was born in 1981. Also in 1981 they purchased and fixed up a home in Berkeley; they apparently sold that home and purchased a new home in Kensington in 1986.

After law school appellant became a practicing attorney and entered into a small partnership; respondent assisted in designing and decorating his office. When that partnership dissolved appellant continued in practice and did well economically. Respondent involved herself in upgrading and maintaining their homes, cooking, cleaning, entertaining and caring for their children.

In the mid-1980's respondent was experiencing back trouble; ultimately, she was diagnosed as having a herniated disc which required surgery. Respondent is currently disabled; her ability to walk is extremely limited, and she must wear a back brace at all times, except when she is asleep.

In 1982 respondent and appellant planned to be formally married. However, appellant was prevented by a storm from returning to the Bay Area on the day of the wedding; so, no formal wedding ceremony ever took place.

### (2) *Evidence Pertaining to Financial Affairs and Support*

Respondent's declaration contained no references to discussions or agreements between the parties about their financial obligations to each other, apart from noting the manner in which they took title to property together. Appellant's declaration stated that he and respondent had no discussions about their financial obligations to each other. Moreover, according to appellant, they never discussed what would happen if they separated, and the issue of support never arose. Appellant did not contest respondent's ownership of a one-half interest in their real property in Alaska and California.[1] However, he denied any further agreements to pool their other accumulations while they were together.

At the hearing on the motion for temporary support, respondent testified that she and appellant had an understanding and had had conversations dealing with "financial, economic equality" and sharing of property. She further testified that they understood and appellant had said that all the property they were involved in was "equal in ownership . . . ."

Very little testimony was offered by appellant on the issue of support. Appellant testified that he and respondent never discussed the concept of support after separation. He stated, "That was not part of our life. It was not part of what we were doing. . . . [W]hen we split up, we split up." He also testified that he did nothing he was aware of to lead respondent to believe he would provide support for her if they separated.

Respondent's testimony on the issue of support was also limited. She testified that appellant did agree (expressly) at one time to support her if their relationship ended. She stated that, although she never expected that she and appellant would separate, they did discuss the subject on one or two occasions, and appellant said not to worry about support.

---

[1]Appellant also does not challenge the award of child support in the sum of $937 per month, made in a separate proceeding.

## II. Discussion

### A. *Appellant's Contentions*

Appellant first contends that the trial court erred in issuing a pretrial "order to pay money." He then argues that, if the order to pay money is considered to be, in reality, a preliminary injunction, it was granted in error because (a) respondent has an adequate remedy at law; (b) insufficient evidence was presented that respondent would suffer irreparable harm; and (c) respondent failed to demonstrate that she has a reasonable probability of success on the merits. Finally, appellant argues that the trial court erred in making its support award retroactive to the date on which respondent's motion for temporary support was filed. Because we agree with appellant's first two arguments, we do not reach the third.

### B. *Discussion*

#### (1) *The Trial Court's "Order to Pay Money" Was Made Without Authority*

In *Marvin I, supra,* 18 Cal.3d 660, 681, the Supreme Court determined that the Family Law Act was not intended by the Legislature to delineate the property rights of nonmarital partners. However, the court also determined (a) that the courts should enforce contracts between nonmarital partners and (b) that in the absence of an express contract, the courts should look to the conduct of the parties to determine whether or not that conduct demonstrates "an implied contract, agreement of partnership or joint venture, or some other tacit understanding between the parties." (*Id.* at p. 665.)

The *Marvin* court also held that, in the absence of an express agreement, the courts may look to a variety of remedies to protect the parties' expectations. Among those remedies, the court suggested that principles of constructive trust, resulting trust or quantum meruit might be employed by the courts. (*Marvin I, supra,* 18 Cal.3d at p. 684.) In footnote 25, the court noted that the remedies suggested were not exclusive and that "additional equitable remedies [may evolve] to protect the expectations of the parties to a nonmarital relationship in cases in which existing remedies prove inadequate . . . in light of the factual setting in which they arise." (*Ibid.*)

The court made one other finding and reserved a decision on one other question which bear on the case before us. In footnote 24, the court stated: "we do not hold that plaintiff and defendant were 'married,' nor do we extend to plaintiff the rights which the Family Law Act grants valid or

putative spouses . . . ." (*Marvin I, supra,* 18 Cal.3d at p. 684.) However, in footnote 26, the court stated: "We do not pass on the question whether, in the absence of an express or implied contractual obligation, a party to a non-marital relationship is entitled to support payments from the other party after the relationship terminates." (*Id.* at p. 685.)

Our analysis of the trial court's "order to pay money" is guided by the Supreme Court's pronouncements in *Marvin.* However, that analysis is complicated by the difficulty we face in understanding exactly what type of order was entered below.

The trial court's statement of decision makes it clear that the court found that there was an "implied" agreement between appellant and respondent. However, the statement of decision does not reflect what specific conduct of the parties led to its conclusion that such an implied agreement existed. (*Marvin I, supra,* 18 Cal.3d at p. 678, fn. 16.) Moreover, the statement of decision fails to set forth the terms of the implied agreement with regard to support. Specifically, the statement of decision does not make findings on such questions as (a) the amount of support one party impliedly agreed to provide to the other, following termination of the relationship; (b) how long such support would last; and (c) most significantly, whether or not such support should be paid from the moment the relationship terminated and before any other rights of the parties were determined by a court of law.[2] We first address the questions of whether or not the trial court's order is supportable as an "order to pay money" or an award of "temporary spousal support" in the absence of an express agreement to make such payments.

#### (a)   *California Law Does Not Give a Trial Court the Power to Issue "Orders to Pay Money"*

■ Appellant correctly points out that there are no provisional remedies available to litigants in civil contract actions apart from those set forth in titles 6.5 (Attachment) and 7 (Other Provisional Remedies in Civil Actions), of part II of the Code of Civil Procedure; those remedies include attachment, claim and delivery, injunction, and deposit in court. (6 Witkin, Cal. Procedure (3d ed. 1985) Provisional Remedies, §§ 1-2, pp. 15-16.) Appellant also points out that, apart from the provisions dealing with an injunction, none of the provisional remedies even arguably applies to the order issued by the trial court herein. (*Ibid.*)

Respondent does not reply directly to appellant's point about the trial court's order potentially passing muster only in the form of a preliminary

---

[2]Our analysis of the evidence supporting the finding of an implied agreement is found in part II.B.(2) of this opinion.

injunction. Instead, respondent first argues that an award of temporary support may take injunctive form. Respondent then argues that appellant is estopped under principles of promissory estoppel and equitable estoppel to deny his legal responsibilities to support respondent. Finally, she argues that the court has "inherent equity powers" to make an award of temporary spousal support.

As to promissory estoppel, respondent refers to the Restatement of Contracts section 90, subdivision (1), which states that: "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Respondent argues that she relied on appellant's commitment "which included the promise of support in the event of a separation." However, that claim is unsupported by the record; no evidence was presented through respondent's declaration or at the hearings that she, in fact, relied on any promise by appellant regarding support after termination of their relationship. Moreover, no evidence was introduced or argument made that respondent acted or forbore from any action based on any promise allegedly made by appellant.

Respondent's "equitable estoppel" argument is based on Evidence Code section 623, which states that "[w]henever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it." Respondent argues that appellant's signing of joint tax returns for the state and federal governments constitutes a representation that he was married and that, accordingly, he should not be permitted to deny the legal responsibilities which would otherwise flow from that representation (presumably, an obligation to provide temporary spousal support).

Respondent's argument fails for at least two reasons. First, no evidence was presented and no argument made by respondent that the litigation in question (respondent's *Marvin* action) arose out of appellant's conduct (signing joint tax returns). Moreover, in order for estoppel principles to apply, the party invoking estoppel (respondent) must be ignorant of the true facts. (11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 177, pp. 858-860.) No such showing can be made here. The evidence was uncontroverted that respondent knew at all times that she was not married to appellant.

In sum, we conclude that an amorphous "order to pay money" is not a cognizable provisional remedy under California law and that appellant is not

estopped from asserting that the trial court exceeded its authority in making such an order.

### (b)  The Trial Court Lacks "Inherent Equity Power" to Award (Spousal) Support Pending Trial

■   Our analysis of whether or not the trial court had "inherent equity powers" to make an award of temporary support begins with footnotes 24, 25, and 26 in *Marvin I*, *supra*, 18 Cal.3d at pages 684-685. Footnote 25 seemingly invites lower courts to fashion equitable remedies to protect the expectations of the parties in a nonmarital relationship. Footnote 26 specifically leaves open the question of whether or not an award of spousal support may be made *in the absence of* an express or implied contractual obligation. Finally, footnote 24 makes it clear that, even if such an award may be proper under some circumstance(s), it cannot be based on the support provisions of the Family Law Act.

We note, preliminarily, that although courts of equity have broad powers, they may not create totally new substantive rights under the guise of doing equity. (*Marvin v. Marvin* (1981) 122 Cal.App.3d 871, 876 [176 Cal.Rptr. 555] (*Marvin II*).) In *Marvin II*, the Second District (Div. Three) reversed the trial court's award of $104,000 for "rehabilitation." In making that judgment, the Court of Appeal noted that there was nothing in the trial court's findings to suggest that such an award was warranted "to protect the expectations of *both* parties." (*Id.* at p. 876, italics in original.) The court went on to note that the trial court's findings that plaintiff needed the award and that defendant had the ability to respond to the need was not enough; as a "nonconsensual" award, it required support by "some recognized underlying obligation in law or equity." (*Ibid.*)

We agree with the court in *Marvin II*. Under *Marvin I*, an award of temporary spousal support cannot be justified as a substantive right under the Family Law Act. Under the facts of this case, the only potential equitable remedy which could justify an award of temporary spousal support was an injunction. To the extent that the trial court's order was intended to constitute an award of such support under other "inherent equitable principles," the court exceeded its authority.[3]

---

[3]We note that the question of whether or not a court may award spousal support to a party in a nonmarital relationship in the absence of an express or implied contractual obligation (the question left open by the Supreme Court in fn. 26 in *Marvin I*) is not before us. Here, the trial court specifically based its order on its finding that the parties had an implied agreement to provide support after termination of the relationship. Our opinion is limited to an analysis of

### (2) *The Trial Court's Order Cannot Pass Muster as a Preliminary Injunction*

■ Our next task is to analyze the trial court's order as a preliminary injunction. Since the effect of the order was to change the status quo by ordering appellant to pay money, pending trial on the merits, we subject it to close scrutiny. (*Board of Supervisors* v. *McMahon* (1990) 219 Cal.App.3d 286, 295-296 [268 Cal.Rptr. 219].)

### (a) *The Evidence Was Insufficient to Support a Finding of an Implied Agreement to Provide Temporary Spousal Support*

The trial court's statement of decision begins with a discussion of footnotes 25 and 26 in *Marvin I*; it then proceeds to describe the evidence introduced by the parties regarding the length and conduct of their relationship, emphasizing the testimony pertaining to their filing tax returns as husband and wife and taking title to real property as husband and wife. The court then discusses respondent's testimony pertaining to appellant's alleged assurances that he would "always support" her. However, the court specifically found that the evidence pertaining to an express agreement to provide support was "[not] enough." Finally, the court found that there was an implied agreement to provide support "in the same manner as if [the parties] had been legally married." It appears that the court then ordered appellant to pay temporary support (either in the form of a preliminary injunction, an award of specific performance, or some other unidentified form of relief) based on its finding that the parties' conduct somehow proved the existence of that implied agreement. Accordingly, we first examine the evidence pertaining to the parties' conduct to determine whether or not substantial evidence supported the trial court's finding.

■ An implied contract " '. . . in no less degree than an express contract, must be founded upon an ascertained agreement of the parties to perform it, the substantial difference between the two being the mere mode of proof by which they are to be respectively established.' " (*Silva* v. *Providence Hospital of Oakland* (1939) 14 Cal.2d 762, 773 [97 P.2d 798].) It is thus an actual agreement between the parties, "the existence and terms of which are manifested by conduct." (Civ. Code, § 1621.) Although an implied in fact contract may be inferred from the "conduct, situation or mutual relation of the parties, the very heart of this kind of agreement is an intent to promise." (*Division of Labor Law Enforcement* v. *Transpacific Transportation Co.* (1977) 69 Cal.App.3d 268, 275 [137 Cal.Rptr. 855].)

---

whether or not that finding is supported by substantial evidence and whether or not the court's order is a proper one based on that finding.

■ The record before us discloses no conduct on the part of the parties from which it can be implied that the parties (particularly appellant) intended to promise that respondent would be supported as if she and appellant had actually been married if the relationship ended. In fact, the record discloses that the parties specifically chose to live together "without any sanction by the State." It is true that the parties took title to certain real property together, as husband and wife. That fact may impact on the parties' rights in that property now that the relationship has ended. However, the record discloses no conduct from which it can be concluded that the parties agreed they would be bound by state laws (sanction) pertaining to temporary spousal support from the termination of the relationship until establishment of contractual rights at trial.[4]

The net effect of the trial court's findings regarding support is to resurrect common law marriages in California. That institution was abolished by the Legislature in 1895, a fact emphasized by the court in *Marvin I*, *supra*, 18 Cal.3d at page 684, footnote 24.

Our reasoning is consonant with that of the Fourth District (Div. One) in *Schafer* v. *Superior Court* (1986) 180 Cal.App.3d 305 [225 Cal.Rptr. 513]. In *Schafer*, the Fourth District issued a writ of mandate ordering the trial court to vacate an ex parte order shortening time for deposition and hearing on order to show cause why respondent, plaintiff in a *Marvin* action, should not be awarded temporary support; *Schafer* ordered the case heard according to the procedural rules applicable to civil litigants generally and not according to family law rules and procedures.

After reviewing the decision in *Marvin I*, the *Schafer* court discussed the fact that the only two appellate cases since *Marvin I* to consider trial court orders granting support to nonmarital partners on implied contract theories (including the court in *Marvin II*) reversed the trial court's orders. (*Schafer* v. *Superior Court*, *supra*, 180 Cal.App.3d at p. 310.) The *Schafer* court also noted that legal principles governing issuance of preliminary injunctions are relevant to a request for support pending trial. (*Id.* at p. 311.)

---

[4]Our dissenting colleague argues that the fact that appellant voluntarily paid money to respondent in varying amounts over a period of four years after the relationship ended constitutes evidence that there was an implied contract under which appellant was obligated to pay (temporary) support. We note, preliminarily, that the trial court did not rely on that fact in support of its finding that there was an implied contract under which temporary support payments were required. Furthermore, we believe that reliance on posttermination conduct to establish the existence of such a contract would constitute poor public policy: if making posttermination payments constitute evidence of a contractual *obligation* to make payments, those who might otherwise voluntarily provide financial assistance to another in need would be discouraged from doing so.

### (b) *Injunctive Relief Was Improper Due to Respondent's Inability to Prove That Damages Failed to Provide an Adequate Remedy and That She Would Be Irreparably Harmed If Injunctive Relief Were Denied*

In its original statement of decision and its further statement of decision, the trial court awarded relief based on its finding that respondent would be irreparably harmed if temporary support were not awarded because she is physically disabled and has modest liquid savings which would not be adequate to support her daily needs and to maintain her mortgage, insurance and property tax payments. The court also found that damages would be inadequate because trial may be years in the future.

The trial court's findings reflect its understanding that the relief accorded respondent was supportable only in the form of a preliminary injunction. Moreover, they reflect the court's understanding that showings of irreparable injury and inadequacy of damages are required for such extraordinary relief. (*Schafer* v. *Superior Court, supra,* 180 Cal.App.3d at p. 311.) However, the trial court confused respondent's perceived needs for cash in the near term with the concepts of irreparable injury and inadequacy of damages.

First, it is absolutely clear that respondent has an adequate remedy under the law. The Supreme Court has determined that nonmarital partners have the same contractual rights as any other unmarried persons, including the right to sue for breach of contract. (*Marvin I, supra,* 18 Cal.3d at pp. 682-685.) That is precisely what respondent has done: she has sued for breach of contract; the relief requested includes a prayer for an award of spousal support, based on express and implied agreements between the parties. An award of damages (spousal support) constitutes an adequate legal remedy, precluding issuance of an injunction. (*Morrison* v. *Land* (1915) 169 Cal. 580, 586, 589-590 [147 P. 259].)

The trial court's findings on irreparable harm were presumably based on respondent's income and expense declarations, her declaration in support of her motion for an award of temporary support, and her testimony at the hearing in support of the motion which reflected that her savings had dwindled from $95,000 to $59,000 by the time of the hearing and that those savings constituted her only means for making mortgage payments and meeting her other monthly expenses.

Even if we accept respondent's showing at face value, it still fell far short of establishing that she would be irreparably harmed by a failure to award temporary support. At best, the record reflected that respondent had a need and that appellant was able to meet it; such a showing is not enough to

justify such an award. (*Schafer* v. *Superior Court*, *supra*, 180 Cal.App.3d at p. 311.)

*Marvin I* makes it clear that unmarried cohabitants have the same contract rights as other civil litigants; however, nonmarital cohabitation does not confer any special privilege over and above those of other civil litigants. (*Schafer* v. *Superior Court*, *supra*, 180 Cal.App.3d at pp. 309-310.) Case law has made it clear that mere monetary loss does not constitute irreparable harm in the context of proposed injunctive relief unless there is some showing that one against whom injunctive relief is sought is insolvent or otherwise unable to respond in damages. (*West Coast Constr. Co.* v. *Oceano Sanitary Dist.* (1971) 17 Cal.App.3d 693, 700 [95 Cal.Rptr. 169].) Here, there was no evidence presented that appellant was insolvent or otherwise unable to respond in damages. In fact, the opposite is true because respondent's motion for temporary support was predicated not just on her needs, but also on appellant's ability to meet those needs.

In sum, the effect of the trial court's order was to give respondent relief to which other, noncohabiting contracting parties would not have been entitled. An award of such relief constitutes an abuse of discretion.

### III. CONCLUSION

We share the trial court's concern with the economic situation confronted by respondent, and we regret that there is no basis upon which her short-term needs can be met under existing law. Justice Mosk's lament (concerning another law) also applies to the situation we face here: "As a judge, I am bound by the law as I find it to be and not as I might fervently wish it to be." (*In re Anderson* (1968) 69 Cal.2d 613, 635 [73 Cal.Rptr. 21, 447 P.2d 117].)

*Marvin I* was decided in 1976. Since that time the Legislature has not seen fit to extend spousal rights under the Family Law Act to unmarried cohabitants. Nor has the Legislature acted to expand the provisional remedies available to unmarried cohabitants beyond those available to other litigants. Respondent's remedy, if any, lies with that branch of government. Accordingly, we reverse and remand to the trial court to vacate its order granting temporary support to respondent. Respondent is to bear the costs of appeal.

Perley, J., concurred.

POCHÉ, J.—I dissent. From our lofty perch my colleagues perceive a very different reality than I do. They fault the trial judge for awarding to a now disabled woman interim support from her partner in a 21-year relationship

during which the couple lived as a family and raised 3 children. The majority instead tell her she has no more recourse than a buyer of widgets faced with breach of a sale contract by its supplier. Their advice to her: Stand in line; we'll offer you a trial someday.

Judge Duncan was candid and direct: "If ever there is to be an award of support based on an implied contract in a *Marvin* case, it is difficult to imagine a scenario more compelling than [the one] presented herein." On the basis of the uncontradicted evidence summarized below, I concur fully in Judge Duncan's assessment.

The majority gloss over significant details of the parties' 21 years of life together. Plaintiff and defendant began living together in 1967, forming a family which included her seven-year-old son by a previous marriage. In 1971, at defendant's insistence, they moved to Alaska. Once in Alaska they set about homesteading, and built a cabin some 12 miles from the nearest town. When defendant left for a job as an investigator in Anchorage, some 200 miles away, plaintiff, then 5 months pregnant remained at the remote cabin in the company of her son.

During the winter months defendant worked in Anchorage. Much of the physical burden of homesteading was literally borne by plaintiff. "During these months, the inside of our cabin was so cold that standing water would freeze. We had no indoor plumbing, and water was hand carried in 5 gallon containers from a frozen stream nearby." Plaintiff kept the home fires burning by splitting wood "and breaking up large blocks of coal with a sledge hammer." She used a sled or a wheelbarrow to bring in clean laundry and food. Summer months were filled with the heavy labor of constructing improvements to the cabin or the homestead. "In the early fall of each year I would do the harvesting, filleting of Salmon, butchering, packaging, canning and freezing of our foods in large volume." Defendant by his declaration characterizes their Alaskan experience as "without any of the comforts of modern life." He, however, emphasizes the communal endeavor: "We grew our own food, built our own cabin, had no modern utilities, and scraped a living from the land as best we could."

After seven years defendant decided he wished to return to the Bay Area to attend law school. Although plaintiff was reluctant to leave the now developed homestead, she did so on the understanding that she too would return to school. While defendant attended law school plaintiff renovated and decorated a "fixer-upper" home that they purchased from their Alaskan savings. The couple had a second child whose poor health precluded plaintiff from returning to college. Defendant completed law school and went into

practice. Plaintiff began to suffer from back problems which were diagnosed as a herniated disc which required surgery and seven months of recovery in bed. The couple purchased a larger home in 1986. In the following year plaintiff again required back surgery, which once again entailed lengthy recuperation.

Defendant and plaintiff separated in 1988. As of April 1992 plaintiff described her physical condition as: "I wear a hard fiberglass back brace all the time except for sleeping. I cannot walk more than one short block, sit for more than 45 minutes a day or drive for more than 20 minutes. I need two periods during the day to lay [sic] down and hired help to run my household."

During the course of the relationship the parties raised their own two children and plaintiff's son. They consistently held themselves out as husband and wife to the Internal Revenue Service, to their insurers, their bankers, and in numerous real estate transactions.

Judge Duncan made his finding of an implied contract to support expressly in reliance upon *Marvin* v. *Marvin* (1976) 18 Cal.3d 660 [134 Cal.Rptr. 815, 557 P.2d 106]. *Marvin* emphatically rejected the notion that it was inappropriate for courts "to apply principles of implied contract" or to "extend equitable remedies" to unmarried partners. (*Id.* at p. 682.) The decision then directed trial courts to look at the conduct of the parties to see if it demonstrated an implied contract. (*Id.* at p. 684.) Having set out various theories of remedial aid, the opinion then noted: "Our opinion does not preclude the evolution of additional equitable remedies to protect the expectations of the parties to a nonmarital relationship in cases in which existing remedies prove inadequate; *the suitability of such remedies may be determined in later cases in light of the factual setting in which they arise.*" (*Id.* at p. 684, fn. 25, italics added.) That is precisely what the trial court did here.

Judge Duncan was fully aware of the novelty of what he was being asked to do: "The court finds that 'what the parties were doing' was maintaining a marriage relationship with everything except a license and ceremony and that there was an implied contract between them that if they separated, plaintiff would be supported by defendant in the same manner as if they had been legally married. . . .[1]

"Finding there is a contract for support, the question remains whether it is appropriate to make the highly unusual provision for damages to be paid

---

[1]Even Justice Clark, author of the concurring and dissenting opinion in *Marvin*, would approve a support award here; "[w]hen the parties to a meretricious relationship show by express or implied in fact agreement they intend to create mutual obligations, the courts should enforce the agreement." (*Marvin* v. *Marvin*, *supra*, 18 Cal.3d 660, 686.)

pending trial. Such a trial may be years away. In the interim, plaintiff is left in poor health living off her dwindling personal assets." "Totally physically disabled and with only modest liquid savings, plaintiff faces irreparable harm in being [un]able to support her daily needs and to maintain her mortgage, insurance and real property tax payments unless she receives injunctive relief forthwith." "Preliminary relief is appropriate only in the absence of other adequate remedies, irreparable injury and the reasonable probability of success at trial on the merits. The court finds those conditions exist here."

The majority does not challenge Judge Duncan's conclusion that plaintiff was confronting irreparable injury if left unaided. Nor does the majority dispute his estimation that plaintiff was likely to prevail on the merits at trial. This would ordinarily be more than enough to uphold the preliminary injunction. (See, e.g., *King* v. *Meese* (1987) 43 Cal.3d 1217, 1226-1228 [240 Cal.Rptr. 829, 743 P.2d 889]; *Nutro Products, Inc.* v. *Cole Grain Co.* (1992) 3 Cal.App.4th 860, 865 [5 Cal.Rptr.2d 41].) The majority, however, chooses to fault Judge Duncan's determination that plaintiff had no other adequate remedy.

It is generally true that equity will not act where there is an adequate legal remedy, and that the legal remedy of damages is ordinarily deemed adequate to redress a breach of contract. But the very authority cited by the majority for these principles admits not only that the legal remedy must be "full and adequate and does complete justice" but also that damages are sometimes inadequate to compensate for a breached contract. (*Morrison* v. *Land* (1915) 169 Cal. 580, 586-587 [147 P. 259].) A more comprehensive formulation of the principles is this: "The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view. [Citation.] It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future. Otherwise, equity will interfere and give such relief and aid as the exigencies of the case may require." (*Quist* v. *Empire Water Co.* (1928) 204 Cal. 646, 653 [269 P. 533].)

The majority further fail to appreciate how adequacy is decided. "The question whether or not a given remedy at law is adequate is in the first instance a question of fact for the trial court and even where the evidence is unconflicting, if opposing inferences may be reasonably drawn therefrom, it still remains a question of fact in the first instance. The finding and conclusion of the trial court thereon will not be disturbed upon appeal, therefore, unless it is shown that the evidence is legally insufficient to support the same." (*People* v. *Stafford Packing Co.* (1924) 193 Cal. 719, 728

[227 P. 485]; accord, *People* v. *Monterey Fish Products Co.* (1925) 195 Cal. 548, 564 [234 P. 398, 38 A.L.R. 1186].)

The evidence supports Judge Duncan viewing the situation in this light: There was an implied contract for support. In the face of defendant's refusal to honor that agreement, plaintiff was forced to seek judicial redress. Ultimate vindication, in the form of a money judgment, was years in the future. In the meantime plaintiff "is left in poor health living off her dwindling assets." Clearly, plaintiff was deemed to face the very real prospect of insolvency or considerably straightened circumstances while awaiting trial, with little or no chance of compensating employment. In the circumstances there is ample basis for the trial court's conclusion that a lump sum money judgment awarded sometime in the not so near future was not a "speedy" remedy, was not a remedy that would secure plaintiff's "whole right [to support] in a perfect manner at the present time," and thus was not adequate.

The majority concludes that the trial court wandered into legal error in equating plaintiff's need to spend her liquid assets with irreparable harm, absent a showing that defendant was insolvent or would be unable to respond to a judgment for damages. (Maj. opn., *ante*, at p. 890.) In short the majority dismisses plaintiff's injury as "mere monetary loss."

Plaintiff is severely disabled and unable to work. How in good conscience can we postulate such a legal fiction in the face of the reality that she will be forced to liquidate what assets she has as she awaits some far off day when our overloaded judicial system finally accords her a trial on her contract claim? To quote Mr. Bumble, "If the law supposes that . . . the law is a ass—a idiot." (Dickens, Oliver Twist, ch. 51, p. 489.)

The evidence fully supports the trial court's finding that the parties did have an implied contract whereby defendant agreed to support plaintiff in the event they separated. Uncontradicted evidence shows that defendant voluntarily paid approximately $190,000 in monthly support payments to plaintiff following their separation, and that these payments were still being made at the time the order for support was made. As an implied contract is one identified by conduct (Civ. Code, § 1621), this alone constitutes substantial evidence in support of the trial court's finding. There is also the matter of the "situation or mutual relation of the parties" from which an implied contract may be inferred. (*Division of Labor Law Enforcement* v. *Transpacific Transportation Co.* (1977) 69 Cal.App.3d 268, 275 [137 Cal.Rptr. 855].) The evidence on this score goes beyond abundant to become overwhelming.

In light of these circumstances, the trial court was fully justified in concluding that the parties were "maintaining a marriage relationship" in all

respects except that of legal sanction. As this court has recently noted, the duty of support is inherent to the marital relationship. (*Borelli* v. *Brusseau* (1993) 12 Cal.App.4th 647 [16 Cal.Rptr.2d 16]; see Civ. Code, §§ 242, 5100, 5132.) It is therefore no great jurisprudential leap to conclude that parties who treat themselves as married may have made provision for this duty of support should they separate. Defendant's postseparation payments of $190,000 put considerable flesh on the bones of the inference of an implied contract derived from the "situation or mutual relation of the parties." (*Division of Labor Law Enforcement* v. *Transpacific Transportation Co.*, *supra*, 69 Cal.App.3d 268, 275.)

The majority speak of the trial court exceeding its jurisdiction by "creat-[ing a] totally new substantive right[ ] under the guise of doing equity." (Maj. opn., *ante*, at p. 886.) The only "right" involved here is the right to support based directly and solely on the parties' agreement. The trial court was thus not creating a right, but only an equitable remedy to preserve that right. (Cf. *Camp* v. *Board of Supervisors* (1981) 123 Cal.App.3d 334, 355-356 [176 Cal.Rptr. 620].) Granted, the remedy it did award is probably unprecedented, but that is not to say, as do the majority, that it is illegitimate. In my view Judge Duncan was following the explicit guidelines set forth by the Supreme Court in *Marvin* v. *Marvin*: fashioning an additional equitable remedy to protect the expectations of the parties to a nonmarital relationship in a situation where existing remedies were inadequate. Far from being illegitimate, the remedy was suggested by the California Supreme Court.

The majority take great umbrage at the notion that any principles of the Family Law Act be applied to nonmarital partners. Apparently they adopt the position that a trial court may not use the magic language of "temporary support," nor base its relief upon the county guidelines used in dissolutions. Such literal mindedness has no place in the law of equity.

Judge Duncan specifically described the problem before him. He noted that the parties had "not probed income and expense issues." "If this were a family law case (it is not), temporary spousal support per Alameda County guidelines would be $1426 per month. In her apparently disabled situation, such awards would not come close to meeting the budget plaintiff has filed with the court. . . . Given the court's conclusion that the parties have agreed to be treated as a married couple, the guideline amount will be ordered." This sounds like equity to me. Indeed it sounds like injunctive relief measured by the only available legal standard in a situation where the parties had failed to offer an alternative measure of damages. There is nothing mysterious about the order or suspect about its rationale.

If 21 years of living together in a mutually supportive family relationship, of taking title to property and otherwise conducting one's financial affairs as if one were married is insufficient evidence of an implied contract to conduct oneself as married with all the moral and legal obligations to the other spouse that such a relationship entails, then I simply cannot imagine any relationship which the majority would find sufficient. The result reached by the majority may be, in the eyes of some, good law; it is lousy justice.

A petition for a rehearing was denied December 27, 1993.